# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### May 26, 2021 Session

## STATE OF TENNESSEE. v. RODGER DALE PRINCE AND AMANDA BEATY

**Appeal from the Criminal Court for Morgan County**
**Nos. 2014-CR-43A      Jeffery H. Wicks, Judge**
**and 2014-CR-43B**

_____

## No. E2019-02058-CCA-R3-CD

_____

A Morgan County jury convicted Defendant Rodger Dale Prince ("Defendant Prince") and Defendant Amanda Beaty ("Defendant Beaty") of first degree felony murder in the perpetration of aggravated child abuse and first degree felony murder in the perpetration of aggravated child neglect. Additionally, the jury convicted Defendant Beaty of aggravated child endangerment. The trial court imposed an effective life sentence with the possibility of parole for Defendant Prince's convictions and an effective life sentence with the possibility of parole plus fifteen years for Defendant Beaty's convictions. On appeal, the defendants assert that: (1) the trial court erred when it allowed the State to amend the indictment; (2) the evidence was insufficient to support their felony murder convictions; and (4) the trial court erred when it failed to grant a mistrial based upon improper testimony. Defendant Beaty also asserts that the trial court erred when it admitted into evidence instances of prior abuse. After review, we affirm the trial court's judgments and remand for correction of the judgments consistent with this opinion.

## Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed and Remanded

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN and J. ROSS DYER, JJ., joined.

Gerald L. Gulley, Jr., Knoxville, Tennessee, for the appellant, Rodger Dale Prince.

Joshua D. Hedrick, Knoxville, Tennessee, for the appellant, Amanda Beaty.

Herbert H. Slatery III, Attorney General and Reporter; Katherine C. Redding, Assistant Attorney General; Russell Johnson, District Attorney General; and Robert G. Edwards

and Jonathan S. Edwards, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION
### I. Facts

This case arises from the June 1, 2014 death of Defendant Beaty's seventeen-month-old son as a result of internal loss of blood due to the transection of his aorta. Defendant Beaty was the victim's mother, and she had two other older children: LB[1] and NB. Defendant Prince was not the children's father but in a relationship with Defendant Beaty and had a child from a previous marriage, EP. Following an investigation, a Morgan County grand jury indicted[2] the defendants for first degree felony murder in the perpetration of aggravated child abuse and first degree felony murder in the perpetration of aggravated child neglect. Additionally, the grand jury indicted Defendant Beaty for aggravated child endangerment.

### A. Pre-trial Motion

The State sought to introduce evidence of the victim's injuries and treatment beginning October 28, 2013, through March 2014, before his death on June 1, 2014. Defendant Beaty filed a motion to exclude evidence of prior bad acts, contending that the victim's injuries in the seven months leading up to the victim's death were inadmissible character evidence. The State asserted that this evidence showed that Defendant Beaty had knowledge that the victim was in danger and that she failed to protect him from ongoing abuse. Further, the State argued that proof of the victim's unexplained injuries was evidence that the victim's injuries were the result of ongoing abuse that was intentional and not accidental.

To demonstrate that the State sought to introduce evidence of the victim's prior injuries for reasons other than propensity, the State offered the testimony of two witnesses: Tarrant McCarley, a Morgan County Medical Center family nurse practitioner, and Dr. Mary Palmer, a pediatrician employed by East Tennessee Children's Hospital ("Children's Hospital"), in Knoxville, Tennessee.

---

[1] It is the policy of this court to refer to minors by their initials.

[2] Initially, in September 2014, the defendants were indicted for first degree felony murder in the perpetration of aggravated child abuse "and/or" aggravated child neglect. The State sought a superseding indictment in May 2018 and the grand jury indicted for the offenses upon which the defendants proceeded to trial.

Ms. McCarley first treated the victim in September 2013 and last saw him in January 2014. On October 28, 2013, he presented with a rash "around his body" and cold symptoms. While a nurse weighed the victim, she saw a lump on his left clavicle area and noted it to Ms. McCarley. Ms. McCarley believed the lump looked consistent with an injury so she ordered an x-ray. She described the victim as "tearful" and stated that he appeared to be in pain. When Ms. McCarley informed Defendant Beaty of the lump and need for an x-ray, Defendant Beaty appeared unaware of the injury.

The x-ray revealed "a clear clavicle fracture." Upon learning of the fracture, Defendant Beaty appeared surprised, responding that she did not know how the fracture would have happened. Ms. McCarley informed Defendant Beaty that the victim needed to go to the hospital for "emergency treatment" and left the room to prepare the paperwork. When she returned, Defendant Beaty said that she had spoken with "the kids" on her cell phone and that the victim's six-year-old sister, LB, had accidentally dropped him on the concrete floor after picking him up from the playpen by his arm. Defendant Beaty reported that the victim had "profuse" vomiting after the fall for several hours. After learning of the additional symptom of vomiting, Ms. McCarley told Defendant Beaty that it was imperative that the victim go to the hospital immediately to rule out possible head trauma from the fall.

Ms. McCarley testified that, in her experience, the victim's injury was not consistent with "accidental trauma" because the injury required "an impact of strong force." She opined that for an injury of this type to be accidental would "definitely [be] a rarity." Ms. McCarley found it concerning that Defendant Beaty was unaware of the victim's injury and then later developed "the story." The victim returned on October 29, 2013, for follow-up after his treatment at the hospital. During this visit, Defendant Beaty relayed that the victim's sister, LB, was now denying that she dropped the victim. The change in story increased Ms. McCarley's concern for the victim's welfare. Ms. McCarley explained that "[a]nytime a child presents with an injury and there's not a clear explanation for it, . . . it's certainly concerning that something happened to that child that could be a non-accidental injury." Ms. McCarley told Defendant Beaty that because the cause of the injury was unknown, she was concerned for the victim's safety and would need to notify the Department of Children's Services ("DCS").

Ms. McCarley next treated the victim on December 30, 2013. The victim presented for a "regular sick visit," but Ms. McCarley noticed bruising to the victim's forehead, jawline, eye, and the tops of his ears. When asked, Defendant Beaty said that the victim "fell into the coffee table" and that the bruising to his ears was because "he always pinched himself." Defendant Beaty indicated that the victim bruised easily. Ms. McCarley was concerned because the bruising on the victim's face was in different stages of healing inconsistent with Defendant Beaty's explanation that the bruising occurred

3

from one fall. She stated that she was most concerned by the ear bruising because it appeared both ears had been pinched in an area where it would require significant force to cause bruising. Ms. McCarley did not believe that a baby of the victim's age could exert the type of force required to cause bruising to that area of his ears.

Ms. McCarley last saw the victim for a sick visit on January 14, 2014. During this visit Defendant Beaty also wanted to discuss how easily the victim bruised. She reported that the victim would bruise at "the slightest touch." In addition to the prior bruising, Ms. McCarley observed bruising to the victim's right upper arm and petechiae, "a hemorrhage type response under the skin." The victim had "pools of blood" underneath his finger nails and under the nails of both big toes. To Ms. McCarley, the blood pooling under the nails appeared as though someone had "smashed" the victim's fingers and toes. When Ms. McCarley inquired about the injury to the fingernails and toe nails, Defendant Beaty offered that the victim must have some type of bleeding abnormality. Ms. McCarley ordered testing of the victim's blood to check for an abnormality. The blood work was "pretty much normal," but Ms. McCarley referred the victim to Hematology to rule out the possibility of a bleeding disorder.

Ms. McCarley testified that she was very concerned about the possibility of abuse. She believed that her initial report to DCS in October was dismissed rather "quickly." Ms. McCarley was concerned that if the defendants told a DCS employee that the victim bruised easily, any report she made about the bruising would likewise be dismissed. She was also concerned that if she reported her concerns to DCS again, Defendant Beaty might stop bringing the victim to Ms. McCarley thereby preventing her from monitoring his well-being. Given these concerns, she decided to refer him to the Hematology Department to build "documentable evidence" to report to DCS. She believed that all of the victim's injuries were consistent with non-accidental trauma.

Mary Palmer, a pediatric physician, testified as an expert witness in the field of child abuse. Dr. Palmer had reviewed the victim's medical records in preparation for the hearing. She recalled that the victim and his brother, NB, were seen by a hematologist oncologist, Dr. Spiller, on January 23, 2014. Dr Spiller indicated concern "for inflicted trauma." Dr. Spiller requested Dr. Perales, a forensic pediatrician, evaluate the victim during a follow-up appointment scheduled on January 31, 2014.

This evaluation included a skeletal survey that showed a healed fracture to the victim's left clavicle (the October 2013 injury) and "healing fractures of the distal right radius" and "at the base of the left first metacarpal." Dr. Palmer worked with the radiologist to estimate the age of the two additional fractures, and she estimated that the fracture to the radius was a few weeks old. Neither she nor the pediatric radiologist could estimate the time of injury for the metacarpal fracture because the metacarpal fracture

4

was "an unusual fracture." Dr. Spiller's reports showed that there was no indication of a bleeding disorder that might cause the victim to be prone to bruising. The absence of any explanation for the bruising and the new bone injuries caused the physicians "overwhelming concern" for non-accidental trauma. Dr. Spiller and Dr. Perales both suspected child abuse based upon the results of their evaluations.

Dr. Palmer testified that in reviewing the victim's medical records, the pattern of the victim's bruising and the bone injuries suggested non-accidental trauma. She stated that it was "extremely unusual" for a child of the victim's age to sustain a fracture to the thumb bone. The results of the January examinations of the victim also supported the suspicion of child abuse. Dr. Palmer stated that Dr. Perales documented child abuse in the medical records as her primary concern, and she notified DCS of her concern.

The victim was treated at Children's Hospital again on March 2, 2014. He presented with fever and pneumonia, but the initial evaluation "fairly quickly involved concerns for on going [sic] non-accidental trauma," and Dr. Palmer was notified. Dr. Palmer found bruising on one of the victim's ears and to his nail beds, consistent with non-accidental trauma. She explained that the location of the bruising on the ear was "very uncommon" in children and the pattern of bruising in January and again in March were not consistent with accidental injury. Additionally, there were abnormalities in the victim's blood work. Due to the blood work, the victim underwent a CT scan of his stomach, which revealed "overwhelming infection throughout" the victim's body and swelling in the soft tissue of the vertebra. Based upon the swelling in the vertebra, an MRI of the spine confirmed swelling in the middle/lower area of the back. An orthopedist, Dr. Sears, evaluated the findings and believed the swelling indicated trauma and the infection was related to trauma to the spine tissue. Dr. Palmer stated that back trauma was "extremely unusual" in children the victim's age. A skeletal survey also revealed a new fracture to the victim's leg.

After these evaluations, Dr. Palmer concluded that the victim was being abused and spoke with Defendant Beaty about child abuse. Dr. Palmer never met with Defendant Prince in person but stated that Defendant Beaty "had him on speaker phone" during the intake interview, which Dr. Palmer thought was unusual. Defendant Prince did not contribute to the victim's history during the intake interview. Dr. Palmer informed Defendant Beaty that x-rays indicated a new healing fracture to the victim's left tibia. Dr. Palmer reviewed the x-rays with Defendant Beaty, and Defendant Beaty asked specific questions about the timing of the injury. Defendant Beaty told Dr. Palmer that the victim had a different caregiver for a time period; however, the time frame did not match the time frame for the bone injury. Dr. Palmer notified Defendant Beaty that Dr. Palmer would be reporting the victim's injuries to DCS. Upon release from the hospital on March 12, 2014, DCS removed the victim from Defendant Beaty's custody.

5

On cross-examination by Defendant Beaty's attorney, Dr. Palmer agreed that the injury that led to the victim's June 1, 2014 death took an "enormous amount of force." Dr. Palmer opined that it would be "unlikely" that someone of Defendant Beaty's size could inflict the amount of force necessary to cause the injuries that ultimately led to the victim's death. On cross-examination by Defendant Prince's attorney, Dr. Palmer agreed that the cause of death on June 1, 2014, was a rupture to the victim's aorta, and he bled out.

After hearing this evidence, the trial court found that Defendant Beaty was "put on notice" of possible abuse in October 2013 when Ms. McCarley told Defendant Beaty she was notifying DCS about the victim's injuries. The court found that the evidence of all the prior injuries was material to proving absence of mistake or accident and that the injuries were intentional. As such, the trial court determined that the proof of the injuries substantially outweighed the danger of unfair prejudice. The trial court stated that the "non-fatal injuries [were] relevant to establish what [the defendants] knew was going on in the home and that the [victim] was in danger and failed to protect the child from that danger."

## B. Trial

At trial, the parties presented the following evidence: On June 1, 2014, the day of the victim's death, Shawn Kamer was at the Eastwood Apartments watching his girlfriend's children. As he was babysitting, he heard a female screaming for help. He opened the front door of the apartment and saw a young female coming up the stairs holding the victim whose lips were "bluish." Based upon his prior training as a volunteer firefighter, he believed the coloring of the victim's lips indicated that the victim had not been breathing for several minutes. He confirmed with the young female that 911 had been called, instructed his girlfriend's children to remain in the apartment, and went downstairs to Defendant Beaty's apartment. When he entered, he saw the victim lying on the couch, and Defendant Prince on his knees next to the couch administering CPR. The victim was not breathing and had a "faint pulse," so Mr. Kamer instructed Defendant Prince to move the victim to the floor where the two men continued to administer CPR. During this interaction, Defendant Prince stated that the victim choked on a cookie, so Mr. Kamer checked the victim's mouth but found nothing.

When Morgan County Sheriff's Deputy Trevor Shadden arrived, he observed the two men administering CPR to the victim, who he described as having a "gray tint" due to lack of oxygen. He inquired about the victim, and Defendant Prince said that the victim was choking on a cookie. Consequently, he took out his flashlight and did a finger sweep in the victim's mouth to check for a blockage but found none. He also looked in

6

the area around the child and found no indication of a cookie. The paramedics then arrived and took the victim to the hospital. Deputy Shadden recalled that Defendant Beaty had "run off" to the bedroom, so he went to the bedroom and told her "you need to go to the hospital."

On cross-examination, Deputy Shadden stated that the victim's gray coloring indicated to him that "[i]t had been a while" that the victim had not been breathing.

Dustin Bonham, the Wartburg Lighthouse Baptist Church preacher,[3] testified that on Sunday evening, June 1, 2014, he was standing in the parking lot outside the church after services when a young female ran out of the Eastwood Apartments screaming for help. The church was situated at the top of a hill, and the Eastwood Apartments were located at the bottom of the hill. Pastor Bonham got in his vehicle and drove the approximate 100 yards down the hill to the apartment complex to offer help.

Pastor Bonham found Mr. Kamer and Defendant Prince administering CPR to the victim inside the Eastwood apartment. Pastor Bonham recalled that the victim was "already turning blue," not breathing, and unresponsive. Pastor Bonham asked what had happened, and Defendant Prince stated that the victim had choked on a cookie. Based upon Pastor Bonham's prior training as an Emergency Medical Technician, he asked for a flashlight to look in the victim's mouth. Defendant Prince, in an agitated manner, stated that he had already removed the residual cookie from the airway. When Pastor Bonham suggested he should also check, Defendant Prince was "just adamant that he got all the cookie, all of it, that [Pastor Bonham] didn't need to do anything else." Pastor Bonham saw nothing in the area around the victim to indicate the presence of a cookie. Further, he noted the victim's belly was expanding while they administered CPR which indicated there was not a blockage or obstruction to the airway.

Tennessee Bureau of Investigation ("TBI") Special Agent Dan Friel worked on the investigation of the deceased seventeen-month-old victim. The original report stated that the victim had choked on a cookie; however, the results in the June 4, 2014 autopsy report indicated that the death was possibly a homicide.

The day after the victim's death, June 2, 2014, Special Agent Friel interviewed Defendant Beaty at the Morgan County Sheriff's Department. He learned that Defendant Beaty and her three children lived in an apartment at Eastwood Apartments ("Eastwood apartment"). During this interview, Defendant Beaty reported that the victim was in the living room while her two other children were in the back bedroom. Defendant Beaty

---

[3] Pastor Bonham was also trained as an EMT although he was not working in that field at the time of these events.

7

had been playing with the victim and went to the kitchen to retrieve strawberries for him. When she returned to the living room, the victim was unconscious. Defendant Beaty told Agent Friel that she ran out of the apartment to call for help and saw Defendant Prince, who entered the Eastwood apartment to attempt CPR on the victim. Defendant Beaty recalled that the victim had been eating a vanilla wafer, and she believed the victim had choked on it. About Defendant Prince's presence at the apartment complex, Defendant Beaty explained to Agent Friel that he was delivering prescription medication from Walgreens to her because her vehicle was not working properly. She provided the receipt from the purchase that reflected the date of June 1, 2014, and the time 4:02 p.m. Agent Friel stated that it appeared to be Defendant Prince's signature on the Walgreens receipt.

Special Agent Friel obtained Defendant Beaty's consent to search the Eastwood apartment. Before searching the apartment, he asked Defendant Beaty if she had done any cleaning since the incident the day before, and she said that she had not. Special Agent Friel searched and photographed the Eastwood apartment, focusing on the living room area. Based upon Defendant Beaty's statement, he also looked for "signs of vanilla wafers" and found none. He explained that he essentially was looking for details to "fill the story." The State played a video recording of the June 2, 2014 search of the Eastwood apartment for the jury. Special Agent Friel noted that the apartment was "pretty clean" and explained that "for what I do . . . that's pretty odd."

On June 2, 2014, Special Agent Darrin Shockey interviewed Defendant Prince at the Morgan County Sheriff's Department. Special Agent Shockey read Defendant Prince's written statement aloud as follows:

> I just pulled up to [Defendant Beaty]'s. Her medicine that . . . [I] picked up for her in Knox as I was getting out of the car I heard [Defendant Beaty] yelling help in hallway. I ran into see what was wrong. I saw [the victim] on couch laid over. I went to him and he was not breathing. I dug some cookie out of his throat, no breathing yet. I started CPR. My daughter had [to] get neighbor upstairs to come down and we continued CPR until help arrived.

Special Agent Shockey confirmed that this written statement was consistent with Defendant Prince's oral statement to him. He described Defendant Prince as "very calm, unemotional, very matter of fact" as Defendant Prince recalled the events of the previous day.

Special Agent Friel obtained surveillance video from the elementary school located across the street from the Eastwood apartment. The video footage showed Defendant Prince's black Dodge Avenger enter the Eastwood Apartments complex at

8

approximately 5:21 p.m. on June 1, 2014. The 911 call was placed at 7:19 p.m. Other surveillance video footage collected showed that, contrary to her statement to Special Agent Friel, Defendant Beaty was not at home until 7:15 p.m. He explained that Darnell's Food Market surveillance video showed Defendant Beaty paying for her items at 6:52 p.m., and Dollar General Store surveillance footage showed Defendant Beaty at the Dollar General Store at 7:13 p.m. In addition to the video, Special Agent Friel obtained receipts from Darnell's Food Market and Dollar General Store showing times consistent with the surveillance video footage.

When this subsequent investigation showed that Defendant Prince lied during the June 2 interview about the timeline of the events, Special Agent Friel attended a meeting on June 14, 2014, at the DCS Office. At this meeting related to a DCS matter, Special Agent Friel asked Defendant Prince why he lied in the June 2 interview about the time of his arrival. Defendant Prince admitted that he arrived at the Eastwood apartment at 5:45 p.m. and that Defendant Beaty then left to go to the stores.

DCS Investigator John Norris first became involved with the victim's family in October 2013 through a referral. Mr. Norris arranged to meet with the family in concert with the Sheriff's Department. At their residence, Mr. Norris spoke with Defendant Beaty and Defendant Prince's daughter, EP. He also observed the victim and his two siblings, six-year-old LB and two-year-old NB. Defendant Prince was not present at this initial meeting because he was at work. Mr. Norris said that he understood Defendant Beaty and Defendant Prince to be in a relationship.

The initial referral indicated that the victim had gone to the doctor and that he had flea bites. As he was undressed, medical personnel noted swelling to his shoulder, which doctors diagnosed as a fractured clavicle. Mr. Norris stated that he interviewed everyone who had access to the victim during that time. He interviewed Defendant Beaty, EP, Defendant Prince, and LB. Mr. Norris testified that "it was reported that [LB] lift[ed] [the victim] out of like a 'Pac n' Play', a play pen, and part of his clothing got caught on the play pen and she dropped him. [Defendant Beaty] . . . did not witness that according to her interview." LB confirmed this version of the events. As part of his investigation into the suspected abuse claim, Mr. Norris also spoke with the orthopedist, Dr. Turner, who treated the victim. Dr. Turner's office conveyed to Mr. Norris that the incident reported as causing the injury was "plausible." Based upon these findings, Mr. Norris closed the file at the end of November 2013, concluding that DCS did not need to take any action at that time.

Mr. Norris received another referral concerning the victim in January 2014. Dr. Perales made the referral after the victim had been seen at the Children's Hospital Hematology Department. During the appointment, medical personnel observed bruising

on the victim, and a skeletal survey showed multiple fractures in addition to the prior broken collarbone. Consequently, Mr. Norris asked Defendant Beaty to bring the children to the Morgan County DCS office.

Mr. Norris identified the Immediate Protection Agreement ("IPA") that was executed during this January 31, 2014 meeting. He explained that an IPA contained certain guidelines that the caregiver agreed to follow in order to insure the safety of the child or children. The IPA reflected that physical abuse was suspected due to the victim's multiple unexplained injuries. Mr. Norris worked with Defendant Beaty on the IPA as he filled out this form. Based upon this interaction during the creation of the IPA, he confirmed that she was aware that physical abuse was suspected. Defendant Beaty had no explanation for the injuries, but she reported that the victim was being evaluated for a possible bleeding disorder.

The IPA included all three children and required the children to stay with Paulette Pollard, a family friend until February 14, 2014. Ms. Pollard and both defendants were present during the January 31, 2014 meeting. Defendant Beaty agreed that her contact with the victim would be supervised and that Defendant Prince and EP would have no contact with the victim. Mr. Norris stated that Defendant Prince was aware he was not to have contact with the victim and "appeared as if he was going to be compliant."

Mr. Norris's next contact with Defendant Beaty was in mid-February of 2014 when she called to notify him that she was moving out of Defendant Prince's home and into her parents' home in Decatur, Meigs County, Tennessee with her children. At the end of February, she called Mr. Norris again to notify him she had taken the victim to the Emergency Department in Athens, Tennessee due to an illness. He suggested that Defendant Beaty take the victim to Children's Hospital for more evaluation, and she agreed to do so.

In the days that followed, Mr. Norris received several phone calls from Children's Hospital and learned that the victim was admitted on March 2, 2014. A physician had ordered a skeletal survey that revealed a fracture to the victim's lower leg. Based upon this new information, Mr. Norris created a new IPA on March 12, 2014. This IPA provided for Defendant Beaty's parents, Stacey and Melvin Siler, to care for Defendant Beaty's three children.

The March 12, 2014 IPA limited contact between the victim and Defendant Prince, EP, and Paulette Pollard. Mr. Norris explained that, based upon the January IPA, Ms. Pollard and Defendant Beaty while supervised, were the only people with caretaking contact with the victim. With the additional unexplained injuries, Mr. Norris felt it important to eliminate anyone who had been in a caregiver role or responsible for the

10

victim's safety, thus he added Paulette Pollard. Mr. Norris also filed a petition with the juvenile court seeking to place temporary custody of Defendant Beaty's three children with Mr. and Mrs. Siler.

On March 21, 2014, Mr. Norris attended a hearing on his petition. Both defendants and EP were present. At the end of the hearing, the juvenile court issued an order preventing Defendant Prince, EP, and Ms. Pollard from any contact with all three children. Mr. Norris spoke with both defendants about the order, and he believed they understood that Defendant Prince and EP were not to have contact with Defendant Beaty's children.

At some point after the March 21 hearing, Defendant Beaty notified Mr. Norris by telephone that she had moved back to Morgan County and gained employment at Life Care of Morgan County. Mr. Norris stated that he had no reason to believe the juvenile court's order prohibiting contact with Defendant Prince and EP was being violated until he received a phone call a week before the victim's death. Based upon information provided in the phone call, Mr. Norris drove by the Eastwood apartment but never saw Defendant Prince's vehicle. Mr. Norris stated that the DCS investigation case had been closed as of mid-April of 2014 but the court case was still "open."

On May 7, 2014, another custody hearing was held in juvenile court. After this hearing, the juvenile court allowed Defendant Beaty's children to return to Defendant Beaty on a conditional basis or through a "trial home placement." The May 7 order continued to prohibit contact between the victim and Defendant Prince and EP. On June 2, 2014, Mr. Norris learned that the victim was deceased. Defendant Beaty was interviewed on June 2 at the Morgan County Sheriff's Department, and Mr. Norris was present for the interview. About his interaction with Defendant Beaty that day, Mr. Norris recalled:

> [Defendant Beaty] told me that she was home all day with three kids and uh, at some point [the victim] had crawled over the couch, collapsed face down on the couch. When she came to look to see because . . . his . . . rambunctious noise had stopped. She saw that he was collapsed. She runs outside and she starts screaming or calling 9-1-1. And at that point [Defendant Prince] was pulling up and came in to assist.

Mr. Norris again spoke with Defendant Beaty on June 4, 2014. He read into the record the notes he took at the time of that meeting as follows:

> No times [were] identified by [Defendant] Beaty. She said that specifics became cloudy. Amber came over to watch the kids. What time did Amber come over? I don't know I left to go to the store. I went to

11

Darnell's first.  I went to the Dollar Store to get [NB] diapers, the Dollar General Store.  Back home I check[ed] on [LB] and [NB], they were still in their room playing.  [The victim] was on the couch eating a cookie.  I told [the victim] I got some strawberries.  I asked him if he wanted to go outside and [ ]he said no.  I told [the victim] that I had got him some strawberries.  I walked toward the kitchen.  [The victim] became too quiet compared to what he was doing.  I turned back around I saw him just lying there on the couch.  I knew by looking at him that something wasn't right.  What does that mean not right?  His color and just how he looked.  Then what did you do?  I ran out into the hallway calling or [y]elling for help.  Do you mean calling 9-1-1 or yelling to whomever could hear you?  At some point I called 9-1-1 and not sure at what point this happened.  [Defendant Prince] came in when I was screaming.

         . . . .

         Where was Amber during this time?  I'm not sure where Amber was at this point, she wasn't there when [the victim] collapsed.  I remember telling her bye but not sure when this happened.  Where was [EP] at this time?  [EP] was with [Defendant Beaty].***  [Defendant] Beaty then began telling of CPR and going to the hospital.  She said that the doctors at Oak Ridge told her his blood was low and she focused on . . . past concern with blood disorders.  At this time the interview was concluded.

Mr. Norris recalled a July 9, 2014 telephone conversation with [Defendant] Beaty, during which she stated that Defendant Prince and EP were present and babysitting her children, including the victim, on June 1, 2014, while she was away from the home.  Defendant Beaty told Mr. Norris that she wanted to notify him before "the media release[,] out of respect for D.C.S."  She stated that this was "the only thing" she had lied about during her statements.  Mr. Norris read aloud his notes about this telephone conversation as follows:

[W]hen she got home [the victim] was sitting on [Defendant Prince]'s chest with his legs pointed to [Defendant Prince]'s shoulders.  According to [Defendant Beaty,] [the victim] was laughing . . . at her as she walked inside the house and told him that she had gotten him strawberries.  . . . EP, 14 year old daughter of [Defendant] Prince, was sitting [o]n the floor, in front of the couch.  [NB] and [LB] were in the back bedroom playing.  When [Defendant] Beaty came inside [Defendant] Prince told [Defendant] Beaty ["]hey, watch this.["]  [Defendant] Prince asked [the victim] if [he]

12

wanted to go with daddy Rodger and [the victim] shook his head no, . . . but was giggling and pointed at [Defendant] Beaty.

. . . .

[EP] helped carry in groceries and that [Defendant Prince] sat [the victim] down . . . to help carry in groceries[.]  [The victim] crawled up on the couch [and] when he . . . got all the way up on the couch he collapsed onto the couch.  [Defendant] Beaty added he was giggling and laughing and then suddenly it stopped just like something you see on T.V.  [Defendant] Beaty said it was like a heart attack that one would see on T.V.

. . . .

[Defendant Prince] yelled [the victim's] name . . . and with a tone of voice I knew something was wrong.  . . . [Defendant] Prince turned him over and there was a little bit of cookie in [the victim]'s mouth and he got . . . it out and wiped it on his shirt.  D.C.S. Investigator J. Norris asked for clarification regarding whose shirt the cookie residue was wiped.  [Defendant] Beaty said [Defendant Prince]'s shirt.  At this point [Defendant] Beaty [provided] little detail.  E[P] ran out the door, went upstairs to get a firefighter, screaming for help.  She, [Defendant Beaty], had called 9-1-1 and was on the phone with them.

Mr. Norris stated that during this phone call he could hear Defendant Prince in the background.

At some point after the July 9 phone conversation, Defendant Beaty requested to speak with Mr. Norris.[4]  Mr. Norris met with Defendant Beaty on September 17, 2014, and she gave him an eleven-page written statement that recounted the day the victim died and the day before his death.  Mr. Norris read the following portion of Defendant Beaty's September 17, 2014 written statement as follows:

I looked down the hall and [LB] and [NB] was in the bedroom still playing like they was all day.  When I opened the front door [the victim] did this little giggle like he always has, it's a ha, ha, ha, giggle.  Anyone can tell you about it, he always did it when I would walk through the door.  As I walked in and [the victim] did this giggle, [Defendant Prince] looked at me

---

[4] Defendant Beaty requested to speak with Mr. Norris and a TBI agent, but the TBI agent was unable to make it to the meeting.

13

and said hey, watch this and then looked at [the victim] and said [Victim], do you want to go home with daddy. [The victim] shook his head and said no and pointed at me. So I took the groceries into the kitchen and [EP] got up and we went back out carrying in groceries. Then on the last trip [Defendant Prince] said, here I will help, do you have more. I said no, and in this – and in the meantime I said no, . . . mommy got you some strawberries. Here let mommy get them and as I went to turn around to go to the kitchen [Defendant Prince] went to put [the victim] down and come help. [The victim] got out of [Defendant Prince]'s lap and walked around him and [the victim] climbed on the couch and then that's when he collapsed. I remember when I first walked in, not exactly sure which trip, [Defendant Prince] told me that somehow [the victim] had uh, bit his lip when he was eating a cookie. And [the victim] was eating a cookie when I came home.

Mr. Norris confirmed that this was the first time that Defendant Beaty had mentioned anything about the victim biting his lip. He continued reading,

When [the victim] collapsed I thought . . . he was choking on a cookie because that was the last thing I seen [sic] him put in his mouth. Before he collapsed [Defendant Prince] flipped him over and said [Victim], oh God, [Victim], and I grabbed the phone to dial 9-1-1. [Defendant Prince] said I don't know . . . I'm not supposed to be here. . . .

And I said I don't care help [the victim] and [Defendant Prince] began CPR and me and E[P] ran outside. E[P] went upstairs and the firefighter that was living up there came down to help. I was fussing at phone cause they wasn't getting to [the victim] fast enough. And then everyone got there and we went to the E.R. to find [the victim] had passed away. My parents took [NB] and [LB] home with them. But I don't understand what happened. At the babysitters the night [the victim] got the mark on his forehead Amber said he tripped and fell on the sidewalk but we only have a paved driveway and then it was odd that she took all of the other three kids to the park but [the victim] stayed there with Alex.

. . . .

And then that Sunday night I got a text from Amber saying she can never watch my kids again. So I called her and told her [the victim] passed away. She . . . [c]ame over to the house the next day, then she said she was coming to the funeral. Then [ ] tells me she's not and it was as though she

14

and Alex disappeared. They moved out of the apartments. Alex quit his job and p[]oof I don't know what happened to them. I don't understand.

Mr. Norris testified that he spoke with Defendant Prince on June 14, 2014. During this conversation, Defendant Prince admitted to violating the IPA provision prohibiting contact since "the beginning." Defendant Prince said that he would enter the Eastwood apartment and that the Beaty family would come to his home. He further admitted being in the apartment when the victim collapsed and became unconscious. Defendant Prince reported performing CPR on the victim. Defendant Prince stated that he, Defendant Beaty, and EP planned the story they would tell about how he came to be in the Eastwood apartment. Mr. Norris confirmed that Defendant Prince was usually present when he spoke with Defendant Beaty.

LB, ten at the time of trial, testified that she was six years old when the victim died. She recalled that she was home on June 1, 2014, with Defendant Beaty, the victim, NB, Defendant Prince, and EP. That afternoon Defendant Beaty left the Eastwood apartment to go to the store, leaving Defendant Prince to watch the children. She did not recall how long Defendant Beaty was gone, but she remembered that she and NB were going to hide and then jump out and scare Defendant Beaty upon her return. LB said that EP had suggested the idea. She and NB, who was two years old at the time, hid in the closet until LB needed to go to the bathroom. She and NB went to the bathroom and ended up playing with the water in the sink. At some point Defendant Beaty entered the bedroom adjacent to the bathroom, crying. LB and NB went to their bedroom, and as they did so, LB saw paramedics in the living room.

On cross-examination by Defendant Prince's attorney, LB stated that she recalled little about Defendant Prince and EP. On redirect examination, LB denied telling a DCS employee that Defendant Prince whipped her with a belt.

Tarrant McCarley testified[5] as a "Nurse Practitioner expert." She worked as a Family Nurse Practitioner at Morgan County Medical Center. Ms. McCarley first treated the victim on September 16, 2013, for a "sick kid visit." She recalled that he presented with congestion and a runny nose. Ms. McCarley again treated the victim on October 28, 2013, this time the victim presented with a rash during the "sick visit." Ms. McCarley described the October 28 appointment with the victim consistently with her testimony during the pretrial hearing. Ms. McCarley saw the victim again the following day, October 29, 2013, as a "follow-up visit" from his treatment at Children's Hospital for his fractured clavicle the previous day. Ms. McCarley said that the CT results from the

---

[5] Ms. McCarley's testimony was entered at the agreement of the parties in the form of a deposition video recording due to Ms. McCarley's unavailability on the trial date.

15

Children's Hospital indicated no head trauma, so she arranged for a pediatric orthopedic referral for the fractured clavicle. Ms. McCarley informed Defendant Beaty that based upon the conflicting information regarding the injury, she would refer the incident to DCS.

Ms. McCarley also treated the victim on December 30, 2013. The victim presented for cold symptoms, but Defendant Beaty complained of abnormal bruising, saying he would bruise when "barely touched." She explained that he had fallen into the coffee table causing his current bruising. Ms. McCarley observed bruising on the tops of both of the victim's ears. He also had a black eye on the left eye and bruising along the left jawline and across his forehead. According to Ms. McCarley, these injuries were not consistent with Defendant Beaty's account of how the injuries occurred, noting that the bruises were at various stages of healing throughout the face. Her treatment plan included medication to treat his respiratory infection and discussion with Defendant Beaty about ways to insure child safety with regard to the bruising. Ms. McCarley also told Defendant Beaty that after the victim recovered from the respiratory infection, she would obtain blood work to explore the bruising issue.

Ms. McCarley again saw the victim on January 14, 2014. The victim had a persistent cough, and Defendant Beaty had the complaint of further abnormal bruising. Defendant Beaty pointed out bruising under the victim's nail beds on his fingers and toes. She also noted a fine red rash that "appeared on his right upper arm." Ms. McCarley testified that the bruising to the victim's nail beds "looked as if they had been smashed." Due to her concern over the progression of unexplained injuries, Ms. McCarley referred the victim to the Hematology Department. The hematologist was also concerned about non-accidental trauma so ordered a consultation with a forensic specialist.

At a subsequent medical appointment involving another family member, the defendants expressed to Ms. McCarley their frustration at being accused of child abuse. Ms. McCarley told them that the victim's safety was the priority, and she offered to monitor his health, suggesting she could see the victim that day. Ms. McCarley told the defendants she would document the victim's improvement, which could potentially help them against any allegations of abuse. The victim was present and Ms. McCarley observed random bruising; however, the defendants declined to have Ms. McCarley see the victim that day but made an appointment for the victim and NB on February 24, 2014. As the appointment date neared, Defendant Prince notified the office that Defendant Beaty had moved and the victim and NB would not be at the appointment.

Marymer Perales testified as an expert witness in the field of pediatrics and child abuse. Dr. Perales consulted on the victim's case at Children's Hospital in her role as a child abuse pediatrician. Dr. Perales explained that the hematologist referred the victim

16

to her following some initial testing to determine whether the victim had a bleeding disorder. Dr. Perales reviewed the hematologist's reports and concluded that the victim did not have a bleeding disorder that would explain his bruising. Dr. Perales conducted a physical examination on the victim on January 31, 2014. She observed multiple bruises on the victim's cheeks and forehead. He had scratches on his nose and chin. She saw additional petechial marks or "pinpoint bruises" on the victim's face and bruising to many of his nailbeds. Dr. Perales ordered a skeletal survey as part of her examination, and it revealed the prior clavicle fracture that was healing well. Additionally, it showed a fracture to one of the two bones in the victim's right forearm and a fracture to his left thumb.

Dr. Perales testified that the fracture to the victim's right arm was in the middle of the bone and would require "a pretty sharp blow" to inflict. Dr. Perales stated that this type of break was not one that the victim, at eleven months old, could have done on his own. Generally a break of this type would be painful and cause a child to favor that limb. Dr. Perales spoke with the defendants who were unaware of the fractures and provided no explanation for how the injuries had occurred. Dr. Perales stated that the fracture to the thumb was also an injury she would not expect to see in a child the victim's age. Dr. Perales identified photographs she took of the victim's injuries during the January 2014 examination. Dr. Perales stated that she had seen bruising to the ears in infants before and it was usually related to a car accident, some incident "that had a good history," or abuse. She had seen injuries like the one on the victim's nail beds less frequently and found it to be unusual. She estimated that the radius and thumb fractures were about ten to fourteen days old. She stated that the thumb fracture would not have limited the victim's mobility as significantly as the radius fracture but that she had observed residual swelling to the thumb during her examination.

Based upon this information, Dr. Perales believed that the victim's injuries were the result of inflicted non-accidental trauma and that he needed to be removed from his current environment for safety reasons. Dr. Perales notified DCS of her medical findings and concerns. DCS personnel requested that Defendant Beaty and the children go directly to the DCS office.

Dr. Perales spoke with the defendants about her concerns, telling them that "somebody's hurting your child . . . and it needs to stop." Defendant Beaty believed it was one of the other children in the home, and Defendant Prince made no comments.

On cross-examination, Dr. Perales testified that the bruising to the tops of the victim's ears could not have been self-inflicted. She explained it is common for children to pinch their ears as a form of self-soothing and it does not result in bruising.

17

Mary Palmer, also employed as a child abuse expert at Children's Hospital, testified as an expert in the field of pediatrics and child abuse. In March 2014, Dr. Palmer consulted on a medical issue involving the victim. The victim was admitted to the hospital on March 2, 2014. He presented at the emergency department, and the attending physicians found "concerning" physical findings, so Dr. Palmer was consulted. The victim was admitted for an infection, but Dr. Palmer was asked to review "other concerns." Dr. Palmer conducted a physical examination of the victim. Dr. Palmer observed petechiae and bruising on the victim. The victim had bruising on his fingernail beds and big toes. The victim presented with a fever that was determined to be related to a blood system infection. A CT scan indicated inflammation around the spine which may have resulted in the blood system infection. The CT scan revealed that the victim's lung tissue was affected and there was fluid around the heart.

A skeletal survey revealed a new fracture to the victim's tibia or lower leg. Dr. Palmer and the radiologist discussed the fracture and determined that the fracture occurred approximately two to three weeks before the March 10, 2014 skeletal survey. Dr. Palmer stated that a fracture of this type would initially limit a child's movement due to pain. Defendant Beaty offered no explanation for the cause of the fracture.

Dr. Palmer photographed the victim's injuries, on March 3, 2014, the day after he was admitted to the hospital. These photographs showed bruising to the victim's nail beds and some minor abrasions on the fingers. Dr. Palmer stated that some of the bruising looked "fresher to the base of the nail bed" while several others had "grown out." The progression of the injuries indicated that there was "ongoing injury to these digits." The jury also saw pictures of bruising to the victim's ears. Dr. Palmer opined that if earlier medical providers had observed bruising to the ears, it would be "more concerning" because ear bruising would likely resolve within seven days. Any bruising outside that period of time would be "ongoing injury." Dr. Palmer identified a photograph of abrasions to the victim's chin and nose, a scratch at the jawline, and bruising to the right cheek bone and lip.

Dr. Palmer testified that none of the diagnostic efforts made were able to uncover any reason that would explain the bruising or bone fractures other than non-accidental trauma. The hospital notified DCS about the medical providers' concerns for the victim's welfare covering the timeframe from November through March, including the new fracture. Dr. Palmer stated that she wanted DCS "to understand [ ], the significance and severity of [the victim's] injuries, and the, and the lack of protection that was being offered him."

Dr. Palmer took a history from Defendant Beaty and, though he did not contribute to the conversation, Defendant Prince was "on speaker phone" during this conversation.

18

After the diagnostic work was finished, Dr. Palmer told Defendant Beaty that she believed the victim was being abused. Based upon Defendant Beaty's questions, Dr. Palmer believed that Defendant Beaty understood that the injuries were inflicted as she attempted to understand a timeframe of the injuries and who would have had access to the victim during the time frame.

Defendant Beaty's cousin, Darlene Hardy, testified that she spoke with Defendant Beaty on the day of the victim's death. Defendant Beaty called Ms. Hardy as she rode to the hospital, asking Ms. Hardy to pray for the victim who had choked on a cookie. Ms. Hardy could hear Defendant Prince in the background and inquired about the no contact order. Defendant Beaty told her that she had no other way to get to the hospital other than Defendant Prince driving her there.

Ms. Hardy again spoke with Defendant Beaty by phone, and Defendant Beaty told her that she had been out buying items for the victim and, when she returned, the victim was choking on a cookie. She later told Ms. Hardy that when she arrived home the victim was sitting on Defendant Prince's lap eating a cookie, and she had offered him strawberries. She also told Ms. Hardy that she believed the victim had a blood disorder. Ms. Hardy attended the victim's funeral and, when she attempted to speak with Defendant Beaty about concerns she had regarding the victim's cause of death, Defendant Prince stood in front of Defendant Beaty when she approached and would not allow for Defendant Beaty to be alone with Ms. Hardy.

Laura Worthington, another of Defendant Beaty's cousins, testified that Defendant Beaty called her on June 10, 2014, and told her that the victim was dead. Defendant Beaty told Ms. Worthington that she went to the store and when she came back, Defendant Prince was giving the victim, who was a gray color and cold, CPR. Defendant Beaty said that the victim had choked on a cookie. She said that she did not "want to tell" because Defendant Prince was not allowed to be around her children. Ms. Worthington said that Defendant Beaty did not mention anything about a bone disorder until the homicide investigation.

Darinka Mileusnic-Polchan, Chief Medical Examiner for Knox and Anderson Counties, testified as an expert in the field of forensic pathology. Dr. Mileusnic-Polchan performed the victim's autopsy in June 2014. The initial information provided to the Medical Examiner's office indicated that it was a "sudden, unexpected" death. The EMS report stated that the victim became unresponsive while eating a cookie. Dr. Mileusnic-Polchan found no cookie crumbs or cookie pieces obstructing the airway or in the victim's mouth. Further, she found no indication that the victim died from a lack of oxygen.

19

Dr. Mileusnic-Polchan testified that the pathological findings were that the cause of death was exsanguination or internal loss of blood due to multiple traumas. Specifically, she noted transection of the aorta. Based upon these findings, Dr. Mileusnic-Polchan concluded that the manner of death was homicide. She explained her conclusion by stating that there was not a possible "accidental way" that the victim could sustain such extensive trauma.

Dr. Mileusnic-Polchan documented numerous bruises and abrasions on the victim's body. She noted for the jury patterned contusions or bruising along the victim's jawline. She stated that the pattern of bruising was consistent with someone gripping someone around the face. Dr. Mileusnic-Polchan also found signs of petechiae, pinpoint hemorrhages, on the victim's face. She explained, "when there is a compression in this area to the neck, and then the veins are compressed because they are very thin walled and . . . easily compressible. When the veins are compressed, then the blood goes to the head, but it cannot drain from the head because of the compression, and then little capillaries burst [causing petechiae]."

Dr. Mileusnic-Polchan identified photographs of bruising on the victim's ear and temple. She stated that the bruising to the ear was "relatively hard to sustain" and was likely caused by someone pinching or pulling the victim's ears.

The internal examination of the victim's body revealed ten subgaleal hemorrhages under the victim's scalp. She explained that given the distribution and the number, it was unlikely that these occurred as a result of "regular child play." These injuries in addition to the trauma to the victim's neck raised concern that the victim's injuries were the result of non-accidental trauma.

Dr. Mileusnic-Polchan also observed bruising to the victim's upper and lower lips. The upper lip had a deep laceration from the victim's teeth breaking through the upper lip and causing a tear. Both of the victim's incisors were chipped. She stated that these types of injuries would be caused by something "forcefully" bringing the upper and lower jaw together. She stated that the laceration would be "relatively hard" for the victim to have inflicted upon himself. Further, due to the absence of any type of chin injury indicating a fall, she believed "a different mechanism" caused these injuries. One of the incisors penetrated almost the full thickness of the victim's lip. Additionally, she found no trauma to the tip of the chin, which would be expected if the victim had fallen. There was only bruising to the sides along the jaw line. The bruising on the victim's body indicated that the various bruises were sustained at different times and showed different stages of healing. The bruising to his thighs were "weeks old." There was no new trauma to the hands, only older bruising to the victim's hands and fingernails.

20

The presence of neutrophils, part of the healing process following an injury, indicated to Dr. Mileusenic-Polchan that an injury to the victim's shoulder occurred the day before his death and was not related to his cause of death. Dr. Mileusenic-Polchan explained that, whereas there was the presence of neutrophils around the shoulder injury indicating the healing process had begun, there were no neutrophils around the injury to the victim's lips or aorta. Those injuries were "fresh hemorrhage."

During the internal portion of the examination, Dr. Mileusenic-Polchan found internal bleeding in the chest cavity surrounding the lungs. Dr. Mileusenic-Polchan testified that she found approximately two-thirds of the total amount of the victim's blood in his chest cavity. She explained that the victim's aorta, the major vessel carrying blood from the heart to the rest of the body, was transected or cut across. She described a portion of the aorta as "completely disconnected." Her examination revealed a large scar that ran along the vertebra and around the aorta, extending across the abdominal and lower lumbar aorta and vertebra. This scar tissue indicated that this area had sustained a previous trauma that was "attempting to heal."

Dr. Mileusenic-Polchan also found that the victim's spine was broken at the junction of the twelfth thoracic vertebra and the first lumbar vertebra. Dr. Mileusenic-Polchan reviewed the victim's March 2014 records from Children's Hospital. In those records, she noted evidence of an injury to the same area of the spine. She confirmed that it appeared that the victim suffered some sort of force that caused his spine to "snap cleanly in half" and caused his aorta to rupture in half. She stated that these types of injuries would not occur as a result of a fall from a slide. She confirmed that the victim would be unable to walk, crawl, or climb on a couch after sustaining the spine fracture or the injury to the aorta. About the injury to the victim's aorta, she explained that "in a couple of heart beats" the victim would have pumped out all of the blood found in his chest cavity. She stated that choking on a cookie would not cause or contribute to the victim's spine injury or transected aorta. She opined that a twisting or flexing to a degree greater than the body could handle would cause these types of injuries. She opined that these injuries could not be caused by a six or thirteen-year-old child and stated that she had only seen this type of injury to the aorta related to motor vehicle accidents.

On cross-examination, Dr. Mileusenic-Polchan testified that the injury to the victim's heart was not "treatable" due to the severity. She confirmed that the transected aorta was "guaranteed to be fatal." She agreed that the victim's injury to his lip was not fatal, but that it had occurred at the same time the aorta "snapped" due to the absence of hemorrhage and inflammation. She agreed that the victim's bruising and prior injuries were not the direct cause of death but "would be connected to cause of death by the temporal relationships to the transection." She confirmed that she considered the victim's prior injuries in determining the manner of death but not the cause of death. Dr.

Mileusenic-Polchan stated that it takes a great deal of force to split an aorta but she could not say "what kind of movement was required." Dr. Mileusenic-Polchan stated that it would be "impossible" for the victim's injuries to result from a fall.

At the conclusion of the State's proof, the trial court conducted *Momon* hearings, and both defendants confirmed that they had chosen to testify. Defendant Beaty testified that she married Wesley Beaty when she was eighteen years old and that they had three children: LB, NB, and the victim. After nine years, the couple divorced, and Defendant Beaty gained custody of all three children. Defendant Prince, who Defendant Beaty had known for many years, offered to allow her to stay with him following her separation from her husband. She and her children moved into Defendant Prince's home on August 16, 2013, and Defendant Prince was attentive and appeared to care about Defendant Beaty's children.

Defendant Beaty recalled scheduling the October 28, 2013 medical appointment for the victim due to concern over a rash. She explained that the victim had spent the night at her parents' house, and they had a dog. She suspected the rash was flea bites due to the victim's exposure to the dog. The morning of the medical appointment, the victim was asleep in his playpen while Defendant Beaty dressed in her bedroom. As she dressed, she heard LB and EP arguing. She left the bedroom to check on the girls and, finding it to be a routine quarrel, she finished getting ready and went to the medical appointment at the Morgan County Medical Center.

During the October 28 medical appointment, a concern over a lump on the victim's shoulder area arose. Defendant Beaty learned that the victim had a broken clavicle. She did not recall speaking with Ms. McCarley about the victim vomiting but explained that the victim had an undiagnosed milk allergy at the time, so it was not uncommon for him to vomit after drinking his formula. Defendant Beaty said that the children were "with her that day" at the doctor's office, so after learning of the fracture, she asked them "what had happened." EP told Defendant Beaty that she had seen LB take the victim out of his playpen and drop him. Defendant Beaty then asked LB, and LB agreed that she had dropped the victim. Defendant Beaty then relayed this information to Ms. McCarley. Ms. McCarley referred the victim to the Children's Hospital, and Defendant Beaty took the victim as instructed.

Later that night, Defendant Beaty spoke with LB, who was six at the time, alone and asked about the incident. During this conversation, LB denied taking the victim out of the playpen and dropping him. Defendant Beaty wondered if this change in story was because LB had not intentionally dropped the victim and felt badly that he was injured. Defendant Beaty later spoke with Dr. Turner who told her that the injury was consistent with the story that the victim had been dropped. Mr. Norris made a similar statement to

her, so Defendant Beaty believed that LB "loved her brother too much to admit that she had got him out and hurt him." Based upon her conversations with LB, EP, Dr. Turner, and Mr. Norris, she did not suspect child abuse.

The next incident was in December of 2013 and related to bruising to the victim's face. Defendant Beaty explained to Ms. McCarley that the victim had fallen "into the coffee table"; however, she did not witness the fall. Defendant Prince was watching the children and, upon her return he told her that while he was out of the room, the victim had gotten out of his "fluffy chair" and fallen into the coffee table. Defendant Beaty said she had no reason to believe that Defendant Prince would lie to her, so she relayed this story to Ms. McCarley when asked about the bruising. As Ms. McCarley and Defendant Beaty discussed the victim's bruising, Ms. McCarley told Defendant Beaty that she needed to watch the victim more closely to prevent him from "falling into stuff." As part of their discussion about how the victim bruised easily, Ms. McCarley expressed her intent to test the victim's blood for a possible cause of the bruising. She waited to withdraw blood, however, due to the victim's upper respiratory infection. Defendant Beaty said that their discussion did not include the possibility of child abuse.

Defendant Beaty recalled that after the first skeletal survey in January of 2014, Dr. Perales confronted her with the possibility of abuse. Defendant Beaty was surprised and "couldn't believe it." She "didn't want to believe that anybody would do that." As she considered the possibility of abuse, she suspected EP because of her animosity toward Defendant Beaty and jealousy of the victim. Defendant Beaty never considered Defendant Prince because she believed that he loved her and the children.

After the second skeletal survey in March 2014, Dr. Palmer spoke with Defendant Beaty about child abuse. Defendant Beaty stated that she was in such disbelief that there could be ongoing abuse, she asked to see the x-rays. Defendant Beaty reiterated that she could not believe that someone who loved them would harm the victim. Defendant Beaty acknowledged that she had been told twice about the possibility of child abuse and admitted that she "failed to protect [the victim]." Defendant Beaty agreed that she did not follow the court orders prohibiting contact between the victim and Defendant Prince. She explained that she did not follow the order because she did not want to believe Defendant Prince would hurt the victim. Further, she did not want to "be alone." She agreed that she made the wrong choice as a parent.

Defendant Beaty testified that by June 2014, she was living with her three children in the Eastwood apartment. On June 1, 2014, Defendant Prince and EP came to the Eastwood apartment to watch the children. Defendant Beaty was suspicious of EP but did not believe that Defendant Prince would allow EP to hurt the victim in his presence. Defendant Beaty ran several errands, and Defendant Prince called her twice to check on

23

her progress, encouraging her to hurry. She did not recall the time of her arrival home, but when she entered the Eastwood apartment, Defendant Prince was sitting on the couch holding the victim on his chest. Defendant Beaty was carrying groceries and told the victim she had brought him strawberries, and he did not respond. She then heard Defendant Prince say, "Oh God, oh God, [Victim]." Defendant Prince shook the victim like he was trying to wake him, but the victim remained lifeless. Defendant Beaty grabbed her phone to call 911 "but [Defendant Prince] looked at [her], tapped [her] eye and said no you can't call because I'm hear [sic]." Defendant Beaty ignored him and called anyway. She explained that she did not care about the consequences and wanted someone to help the victim.

Defendant Beaty grew angry with the 911 operator because she believed "they weren't quick enough. They weren't hurrying." Defendant Beaty said she felt an urgency to obtain medical assistance for the victim. She recalled the paramedics arriving and taking the victim in the ambulance. Defendant Prince drove Defendant Beaty to the hospital. On the drive, she heard "them" say that the victim had choked on a cookie. When she arrived at the hospital, she learned that the victim had not survived. She did not know what had caused his death and could not accept that he was dead. Defendant Beaty spoke with law enforcement while at the hospital. She stated that she was not honest with them because Defendant Prince had told her what to say. She complied out of fear that LB and NB would be taken from her if law enforcement discovered she had violated the court order by allowing Defendant Prince contact with the victim.

Defendant Beaty testified about her prior statements about the events leading up to the victim's death. She admitted that her description of the victim laughing and giggling when she entered the Eastwood apartment on June 1, 2014, was not true but she had said it because "that's the way he always did" and this image was "more comfortable." She reiterated that this detailed description of the victim upon her entering the Eastwood apartment was false.

On cross-examination by the State, Defendant Beaty testified that she now believed that Defendant Prince killed the victim. She stated that she came to this conclusion once she "got locked up" and "started reading like, what happened." She said that she did not initially want to believe that Defendant Prince harmed the victim, so it took her "a couple of years" to realize Defendant Prince's role in the victim's death.

Defendant Beaty testified that the same day that she separated from her husband, she moved in with Defendant Prince and began a relationship with him. Defendant Beaty agreed that the October 28, 2013 appointment with Ms. McCarley was due to a rash and "some sniffles." Defendant Beaty had not noticed the lump by the victim's collarbone or observed the victim express any pain over his collarbone. She stated that EP had loaded

24

the victim into and out of his car seat and carried him into the medical appointment while she looked after LB and NB. She stated that, on the morning of the medical appointment when she heard EP and LB arguing and checked on them, the victim was sitting in his playpen playing with his toys when she entered the room. Defendant Beaty denied calling home during the appointment to learn about the victim's fall, reiterating that the children were with her at the appointment. Defendant Beaty stated that LB dropped the victim, and EP put him back in the playpen. She said that this incident was the source of the argument that drew Defendant Beaty into the room to check on them.

Defendant Beaty agreed that she knew Ms. McCarley was notifying DCS about the broken collarbone, but she denied that it was because of suspected child abuse. Defendant Beaty believed that DCS was going to become involved "so that maybe we [could find] out what happened." She said that the victim began bruising easily in December 2013. She agreed that both Dr. Spiller and Dr. Perales told her there was nothing in the bloodwork to explain the bruising and that, additionally, the victim had broken bones. Defendant Beaty admitted that she did not know how the broken bones occurred and offered no explanation to Dr. Perales. She stated that she never observed the victim favoring his arm or expressing pain related to his arm or thumb. She explained that she did not pick up the victim often and that Defendant Prince had been the main caretaker for the victim. She agreed that on January 31, 2014, Dr. Perales told her that the victim was in danger and his injuries were the result of non-accidental trauma and that Dr. Perales was reporting these signs of abuse to DCS.

Defendant Beaty agreed that Mr. Norris was trying to protect her children. She signed the IPA on January 31, 2014, and agreed that this IPA was a "warning" that her children were in danger. Defendant Beaty confirmed that Paulette Pollard was a friend of Defendant Prince's who babysat the children. She had agreed to Ms. Pollard keeping her children and supervised visitation. This arrangement ended on February 14, 2014. Defendant Beaty still lived with Defendant Prince at this point so the children returned to his home and exposure to him. Defendant Beaty denied notifying John Norris of the victim's March 2014 illness. She said that she notified the children's pediatrician about the victim's high fever, and he referred her to the hospital. Medical personnel at the Athens emergency department told Defendant Beaty that the victim had a cold. The following day, she took him to Children's Hospital.

Defendant Beaty testified that she was unaware that Defendant Prince had called and cancelled the children's February 2014 medical appointment with Dr. McCarley. She said that Defendant Prince had "kicked [her] out" mid-February, but they resumed their relationship after the victim was released from the hospital in March 2014. Defendant Beaty learned of a new fracture to the victim's leg during the March hospitalization. Defendant Beaty denied noticing any difference in the victim's ability to

walk during the time leading up to the x-ray. She agreed that she was "just not paying attention." Defendant Beaty agreed that, during this time period, she had been using unprescribed opiates supplied by Defendant Prince. She testified that she could not explain how the victim broke his leg.

Defendant Beaty testified that from March 12, 2014, the day the victim was released from the hospital, until May 7, 2014, the children were removed from her custody and lived with her parents. During this time, Defendant Beaty lived with Defendant Prince. She was aware that the March 12 court order prohibited Defendant Prince and EP from contact with any of her children. Dr. Palmer told Defendant Beaty on March 12, 2014, that the victim was displaying classic symptoms of child abuse and that Defendant Beaty needed to protect her children. A court order returned Defendant Beaty's children to her on May 7, 2014, but the no contact provision remained as to Defendant Prince and EP. She confirmed that Defendant Prince was present in court with Defendant Beaty and was aware of the provision. Although Defendant Beaty could not recall whether EP was at the hearing, she confirmed that EP was aware the no contact order applied to her. Defendant Beaty admitted that Defendant Prince's contact with the victim resumed "pretty much immediately" despite the court order.

Defendant Beaty agreed that Ms. McCarley, Dr. Perales, and Dr. Palmer had all warned her that her children were being abused in October 2013, January 2014, and March 2014, respectively. She agreed that the Juvenile Court twice ordered that the children have no contact with EP and Defendant Prince, and yet, she allowed contact. Defendant Beaty stated she was unaware of how the victim sustained the ten bruises found on the victim's scalp during the autopsy. Defendant Beaty recalled that, when they arrived at the police station on June 2, 2014, Defendant Prince instructed her to say that the victim choked on a cookie. She said that she, EP, and Defendant Prince were in the car and all agreed to that version of the events. Defendant Beaty said that, at the time, she believed it "was the truth."

Defendant Beaty agreed that she lied when she told Mr. Norris on June 4, 2014, that Amber Purdue, her neighbor, had been watching the children. She explained that she told this story out of fear that the State would remove LB and NB from her home if it was discovered that Defendant Prince was present in violation of the no contact order. Defendant Beaty agreed that on June 2, 2014, she called Amber Purdue who came over to Defendant Prince's house. Defendant Beaty asked Ms. Purdue to lie for her and tell the police that she had been babysitting the children instead of Defendant Prince. Ms. Purdue declined to lie for Defendant Beaty. Defendant Beaty agreed that she made up all the details she provided to Mr. Norris on July 9, 2014, including that Defendant Prince removed cookie from the victim's mouth and wiped the residue on his shirt.

26

Defendant Beaty testified that in retrospect she could identify behavior the victim exhibited that demonstrated his fear of Defendant Prince. When asked for an example, she said that the victim would cry anytime Defendant Prince entered a room. At the time, she believed it was due to Defendant Prince's large size. She stated that the victim would not cry when EP entered the room. The State read a portion of the September 17, 2014 eleven-page statement Defendant Beaty provided to Mr. Norris, in which she described in detail the victim laughing and giggling when she returned to the Eastwood apartment on June 1, 2014. She admitted that none of these details were true. She agreed that she made up these details to protect Defendant Prince.

Defendant Beaty testified that, after writing the September 17, 2014 statement, she continued a romantic relationship with Defendant Prince.

On cross-examination by Defendant Prince's attorney, Defendant Beaty testified that she had known Defendant Prince for ten years or more. She denied that he ever physically abused her. She recalled that at some point in their relationship he asked Defendant Beaty if he could adopt the victim. Defendant Beaty agreed that she had "a drug problem" but denied that Defendant Prince's offer to adopt the victim was because she was "overwhelmed" by her children. She agreed that she and Defendant Prince broke off their relationship in February 2014 due to her drug use.

Defendant Beaty testified that Ms. McCarley lied when she testified that Defendant Beaty called home during the October medical appointment to inquire about a possible cause for the victim's collarbone fracture. She maintained that all of the children were with her at the medical appointment. Defendant Beaty agreed that the night before the victim's death, she sent Defendant Prince fifty or sixty text messages insisting he "come over." She sent a text message to him that she had been drinking although she testified that she lied in that text message. She sent another text message that indicated that she could not find the victim. She explained that the content of that text message "was a joke." She sent another text message stating that the victim's nose would not stop bleeding. She admitted that this too was a lie. She explained that she told Defendant Prince these stories in an effort to persuade him to come over to the Eastwood apartment.

Defendant Beaty testified that she moved in to her parents' house in February 2014, after her break-up with Defendant Prince. While Ms. Pollard was watching the children, however, Defendant Prince still had contact with the children. She stated that he came to the hospital on two occasions during the victim's March 2014 hospitalization.

Defendant Beaty clarified that, when she told the police on June 1, 2014, about the victim choking on the cookie, she had gained that information from Defendant Prince.

27

She explained that when she returned from the store, Defendant Prince told her that the victim had choked on a cookie, so she relayed that information to 911. Defendant Beaty denied that Defendant Prince had forced her to make false statements but explained that she believed him when he told her that the victim choked on a cookie.

Defendant Beaty maintained that the victim always cried when around Defendant Prince but could not explain her earlier testimony that Defendant Prince largely cared for the victim's needs. She had given this testimony in response to a question about why she had not observed the victim displaying behavior consistent with being injured. When asked to explain what she meant when she testified that Defendant Prince took care of the victim "most of the time," she responded:

> That, I didn't see things, because it was him that always took care of [the victim], so I didn't notice when [the victim] was hurt or had something broke or even noticed to pay attention, because he made sure that I didn't because he had taken care of [the victim].

Defendant Beaty denied sending Defendant Prince a text message that read, "I don't care what you do, just over these f**king kids, I wish I didn't f**king have, God dang, they can't even f**king listen." Although it was among the text messages sent from her cell phone to Defendant Prince's cell phone, Defendant Beaty could not explain who sent that text message to Defendant Prince.

Defendant Beaty agreed she was aware of the autopsy findings at the time she wrote her September 17, 2014 statement. She maintained that she wrote the portion about the victim sitting on Defendant Prince's chest giggling because that was the way she wanted to remember him. She confirmed that the September 17, 2014 statement was the last statement she had given and that, until her trial testimony, she had never corrected her September 17, 2014 statement.

Defendant Beaty testified that she did not know how the victim's leg was broken. The last ten days of February 2014, she was living with her parents and did not notice any limping. The children returned to her custody from Ms. Pollard on February 14, 2014. She confirmed that she and the children lived with Defendant Prince from February 14, 2014, until February 20, 2014, when she moved out of Defendant Prince's house. Thus, Defendant Prince was not around the Beaty children for approximately ten days before she took the victim to the hospital on March 2. She further agreed that Defendant Prince had no access to the children until May 7 because the State placed custody with Defendant Beaty's parents following the victim's March hospitalization.

28

Following this testimony, Defendant Beaty rested her case. Defendant Prince presented six witnesses, both family members and friends, who testified that Defendant Prince was not a violent person and was a good parent to EP. In addition to those witnesses, he presented several other witnesses on his behalf. We summarize their testimony as follows.

Ms. Pollard testified that she took care of the victim, LB, and NB for two weeks in February 2014, at the request of DCS. During this time period, the children had supervised visitation with the defendants. Ms. Pollard had known Defendant Prince his entire life and had never known him to be violent or aggressive. She had occasion to observe Defendant Prince with his own child, EP, and never observed him being "mean" to her. During the time she cared for Defendant Beaty's children, she did not observe any bruises or injuries on the victim. She reported to Mr. Norris that the victim's ears would sometimes turn blue. She had no idea what caused this to occur.

Samantha Prince, EP's mother, was married to Defendant Prince for thirteen years before their divorce on September 18, 2013. She testified that Defendant Prince was never violent or abusive during their relationship. Samantha Prince agreed to the grant of full custody of EP to Defendant Prince because she believed that he was more financially stable and could give their daughter a better life.

Deborah Roberts Castro, Samantha Prince's mother, testified that she told Agent Friel that Defendant Beaty had previously threatened Samantha Prince's life, trying to convince Defendant Prince to kill Ms. Prince. Ms. Castro said that she did not believe that Defendant Prince would actually harm Samantha Prince in this way but that she did not trust Defendant Beaty. To her knowledge, Defendant Prince had never physically hurt either Samantha Prince or EP. She said that Defendant Prince and EP had a great parent-child relationship. She stated that he had been a good husband and was a good father.

On cross-examination by the State, Ms. Castro agreed that she spoke with Special Agent Friel on June 11, 2014; however, she could not recall whether she told Special Agent Friel that Defendant Prince had a temper. She agreed that if Special Agent Friel's notes of the meeting included her saying Defendant Prince had a temper, the notes were likely accurate. Ms. Castro said that she did not recall saying Defendant Prince was controlling but that she would defer to Special Agent Friel's notes. She agreed that Defendant Prince blocked her contact with EP because he was angry at Ms. Castro's husband who "had took him to court." When Defendant Prince allowed Ms. Castro to speak with EP, it was through a speaker phone and in his presence. She agreed that she did tell Special Agent Friel that Defendant Prince "made" Samantha sign the divorce papers.

On cross-examination by Defendant Beaty's attorney, Ms. Castro said that she did not believe her daughter, Samantha Prince, would agree to having no custody of her daughter if Defendant Prince had not "made her."

EP testified that her parents' divorce was difficult but that Defendant Prince was very supportive of her during that time. She stated that her family life changed again when Defendant Prince met Defendant Beaty. She explained it was hard for her because this relationship began so quickly after her parents' relationship ended.

EP testified that the victim sustained the lump to his shoulder in October 2013 when he fell out of his playpen. She said that LB, then six years old, was picking him up and dropped him. The victim cried when he was dropped but did not "bruise or anything." Later, while Defendant Beaty and the victim were at the doctor's appointment, she was asked what had happened. EP stated that she and LB did not go to the doctor's appointment with Defendant Beaty and the victim. She stated that neither Defendant Prince nor Defendant Beaty were in the room when LB dropped the victim. She said that she never saw Defendant Prince hurt the victim.

EP testified about an incident in December 2013 when the victim fell into a coffee table. She did not see the victim fall but later heard about the incident. She could not recall who told her about the fall.

EP testified that she got along well with Defendant Beaty's children and said they were like siblings. She babysat the children "a lot" and enjoyed her time with Defendant Beaty's children but expressed that it was also hard because "I wanted to be a kid myself."

The night before the victim's death, EP went with Defendant Prince to a party at Britta Snow's house. A friend of EP's, who was twelve years old at the time, also went to the party with them. After the party ended, Defendant Prince drove the girls home where EP's friend was going to spend the night with EP. When they got home, Defendant Beaty was parked in the driveway with her three children in the car. EP recalled that because Defendant Beaty was drunk, Defendant Prince would not allow Defendant Beaty to drive, so Defendant Beaty and her children also spent the night at the Prince home.

The next morning, Defendant Beaty left, and Defendant Prince and EP drove EP's friend home to the Knoxville area. On their return trip, Defendant Prince stopped at a Walgreen's in the Knoxville area and picked up Defendant Beaty's medicine. Defendant Prince drove to the Eastwood apartment to deliver the medication. When they arrived,

Defendant Beaty was in a hurry to leave. Defendant Beaty went to the store and was gone for about forty-five minutes. While Defendant Beaty was gone, the television was on, but EP was on her phone scrolling through Instagram. The victim had been playing with his siblings, and EP offered NB and the victim a cookie. She took them to the kitchen and gave then vanilla wafers from a cookie jar on the counter. NB ate his and the victim took his cookie and walked over to Defendant Prince, who was seated on the couch. EP denied that the victim was ever afraid of Defendant Prince.

When Defendant Beaty returned, she brought in groceries. Defendant Prince asked if there were more groceries in the car, and when Defendant Beaty indicated affirmatively, Defendant Prince and EP got up to help bring in groceries. The victim had been sitting on Defendant Prince's chest, so Defendant Prince sat the victim on the floor when he stood. The victim attempted to crawl up on the couch, and then suddenly collapsed. EP recalled that, before this, the victim had been running around the apartment and playing. She described the victim as very active.

EP recalled that the victim collapsed shortly after Defendant Beaty returned. The victim didn't move, so Defendant Prince immediately started CPR, and EP ran up the hill to the church to call for help. She saw people leaving the church, and Dustin Bonham came to the apartment. She then went upstairs and called for help. The man upstairs came to the Eastwood apartment immediately. At this point she believed the victim was alive because "Dad had his heartbeat back." She recalled that no one else had said they had a heartbeat.

On cross-examination by the State, EP testified that she viewed the victim as a "baby brother." About the victim's broken bones, EP stated that she never saw him favoring his arm or hand. She stated that she did not "know about [the broken arm and broken thumb] but all I know is I heard about it, that it could have happened from when he was putting on his jacket and it got caught." She did not recall who told her this. She also recalled hearing that the victim had brittle bones but could not recall who told her that although she believed that the victim did have brittle bones. Further, she was told that he had a blood problem that contributed to him bruising easily. She did not recall who told her about the blood disorder, but she believed the victim had a blood disorder. She was never told about the laboratory results from Children's Hospital.

EP, she testified that she did not recall the victim's March hospital admission clearly. She did not recall being told about the victim's medical issues or that he had a broken leg. She remembered being told "just a little" about injuries along his back but stated that she did not "know anything about it."

EP did not witness anything the day of the victim's death that could have contributed to the victim's fatal injuries other than when he tried to climb on the couch and collapsed. When asked if the victim had the cookie in his mouth when he collapsed, EP stated, "I don't even know if he got the chance to eat it." She did, however, recall Defendant Prince saying he removed cookie from the victim's mouth. She continued, saying that she observed Defendant Prince remove the cookie and wipe the residue on his shirt. EP confirmed that she was aware that she was not to be around the victim or his siblings. She said that she knew "all about" the court order prohibiting contact and that she, Defendant Beaty, and Defendant Prince discussed it.

EP testified that she spoke with a DCS investigator on June 2, 2014, after the victim's death. She did not remember telling the DCS investigator that when she and Defendant Prince arrived at the Eastwood apartment to give Defendant Beaty her medication, Defendant Beaty came running outside yelling for help. She further did not recall telling the DCS investigator that they were not at the Eastwood apartment until after the victim was already in crisis. When asked if she remembered telling the DCS worker that she and Defendant Prince entered the Eastwood apartment only after Defendant Beaty came outside yelling for help, EP responded that Defendant Beaty asked her and Defendant Prince to "lie about it at first." EP admitted initially lying to the DCS investigator but stated that "we did go back and we did fix that."

EP agreed that the events of June 1, 2014, were upsetting to her, and she had sought counseling as a result. When asked if she told her therapist that she was afraid she and Defendant Prince would be arrested for the victim's death, EP responded, "No, that was a lie." When asked if she recalled telling the therapist that she would "take the blame" for the victim's death before she would allow her father to go to jail, she stated, "That was a lie, too." EP testified that she "[n]ever" disclosed to the therapist that Defendant Prince was involved in drug use and selling drugs.

Linda Rose, Defendant Prince's mother, testified that Defendant Prince was not violent or aggressive. She testified that Defendant Prince treated the victim as if he were his own son and that he had wanted to adopt the victim. Ms. Rose never observed the victim acting fearful of Defendant Prince. She stated that generally when the defendants were out, it was Defendant Prince who carried the victim. Ms. Rose was aware that EP's therapist had reported that EP said she would take the blame for the victim's death but stated that the therapist was lying. Ms. Rose was present when Defendant Beaty asked Amber Purdue to tell law enforcement that she was babysitting the victim on June 1, 2014. Ms. Rose told the two women that they could not lie and left the room.

Defendant Prince testified that he filed for divorce from Samantha Prince in April 2013 and that it became final in September 2013. He said that his relationship with

32

Defendant Beaty began in August 2013 when Defendant Beaty posted on Facebook about her husband leaving her. Because he too was going through a divorce, he offered support. Ultimately, the two entered a romantic relationship, and Defendant Beaty moved into Defendant Prince's house where he and EP lived. At that time, EP was thirteen. He approximated that the victim was ten months old, NB was two, and LB was six.

Defendant Prince testified that he knew "nothing" about the victim's broken collarbone. He said that Defendant Beaty took the victim to the doctor while Defendant Prince was at work. During the appointment, Defendant Beaty called home and spoke with EP. EP had seen LB drop the victim while picking him up out of his playpen. Defendant Prince denied any involvement in causing that injury. Defendant Prince spoke with Mr. Norris after Ms. McCarley referred the case to DCS. His statement to Mr. Norris was consistent with his trial testimony.

Defendant Prince denied ever causing any harm to the victim. Defendant Prince was aware that Defendant Beaty took the victim to the doctor in January of 2014 and that he had bruising on his ears and fingernail beds. He did not know what caused those injuries but said that Defendant Beaty gave the victim medicine that caused the victim's ears to turn blue. Defendant Prince stated that he was present for the results of the January 31, 2014 skeletal survey, but as to how the victim sustained those fractures, he "didn't have a clue what happened." Following this incident, when the victim stayed with Paulette Pollard from January 31, 2014, to February 14, 2014, he only had supervised visits with the victim. He confirmed that Ms. Pollard was always present during any interactions he had with the victim.

Defendant Prince testified that he also asked Defendant Beaty to move out of his home due to her drug use in February 2014. He stated that he did not want drugs around his daughter. To his knowledge, Defendant Beaty moved in with her parents. Defendant Prince did not see the victim during this time.

During the victim's March 2014 hospital stay, Defendant Prince went to Children's Hospital, but Defendant Beaty still resided with her parents. Defendant Prince understood that the victim was septic with Strep B and was administered a blood transfusion during the March hospital stay.

Defendant Prince confirmed that he had asked Defendant Beaty about adopting the children, and she had said if he married her, he could adopt the children. Defendant Prince, however, would not marry Defendant Beaty until she ceased her drug use. He stated that when Defendant Beaty was sober she was a good person and a good mother.

33

Defendant Prince recalled that DCS again removed custody from Defendant Beaty from mid-March to May 7, 2014. Defendant Prince had no access to the children during that time period. Upon Defendant Beaty regaining custody, she moved into the Eastwood apartment. Defendant Prince admitted visiting Defendant Beaty and the children at the Eastwood apartment. Although Defendant Prince was never served with the court order prohibiting contact with Defendant Beaty's children, he confirmed that he was aware of the order. When asked why he went to the Eastwood apartment in violation of the no contact order, he said, "I loved the kids. . . . I loved [Defendant Beaty]. I knew I wasn't harming the children. I knew I wasn't harming [Defendant Beaty], I was good to her."

Defendant Prince testified that, even when Defendant Beaty was stealing his belongings and pawning them in February 2014, he never struck or threatened Defendant Beaty. He did, however, make her move out of his home.

The day before the victim's death, Defendant Prince attended a going away party with EP and one of her friends. Defendant Prince recalled that Defendant Beaty sent him text messages all throughout the night. He confirmed that he had received that night, the text message about the "F'ing kids" earlier read during the trial that Defendant Beaty denied sending. Throughout the night, she sent text messages that the victim fell off a slide or that she had lost the victim. Defendant Prince left the party at around 11:00 p.m. When he arrived home, Defendant Beaty was in the driveway. She had the children with her and had been drinking, so he took her car keys and told her to go in the house and go to bed. He explained that he did not want Defendant Beaty driving with the children. The next morning, Defendant Beaty took her children back to the Eastwood apartment, and Defendant Prince and EP drove EP's friend to Oak Ridge. During this trip, Defendant Beaty called and asked Defendant Prince to get her medicine from Walgreen's. He said the medication was Suboxone to help her with her pain pill addiction.

Defendant Prince testified that, on June 1, 2014, he arrived at the Eastwood apartment at about 5:30 p.m. Defendant Beaty immediately announced that she needed to go to the store, and LB said she did not want to go. Defendant Prince intervened and said that he would watch the children while she ran to the store. Defendant Prince estimated that Defendant Beaty was gone for approximately forty minutes. While she was away, he called Defendant Beaty to check on her progress. He called another time to remind her to buy diapers for NB at the Dollar Store on her way back to the Eastwood apartment.

While Defendant Beaty was away, the victim and NB played in the bedroom. When they came out to the living room, EP offered the boys a cookie. They all three went in the kitchen to get the cookies. Defendant Prince asked the victim for a bite of his

34

cookie, so the victim walked over to Defendant Prince and crawled up on Defendant Prince's chest. Around this time, Defendant Beaty returned with bags of groceries and told the victim she had strawberries for him. Defendant Prince stood up from the couch to help carry the groceries inside and set the victim on the floor. The victim started crawling up on the couch and then fell on the floor.

Defendant Prince assumed the victim was choking on his cookie, so he flipped him over, said the victim's name, did a finger sweep, and wiped the residue on his shirt. Defendant Prince said that the victim had no pulse and was not breathing, so he began CPR. Defendant Beaty called 911 while EP ran up the hill to the church to get help. When Deputy Shadden arrived he took over performing CPR on the victim with Mr. Kamer. "They" said the victim had a faint pulse and then the ambulance arrived.

Defendant Prince testified that Defendant Beaty was concerned about losing custody of NB and LB because Defendant Prince was at the Eastwood apartment in violation of the no contact order. Defendant Beaty told Defendant Prince to lie about his presence at the Eastwood apartment, and Defendant Prince did so initially. On June 14, 2014, however, at a meeting at the DCS office, Defendant Prince told the truth about what had occurred. He confirmed that his account of the events has remained consistent since the June 14 meeting. He admitted that, following the victim's death, he continued writing letters to Defendant Beaty. Initially, he had hoped their relationship could still work.

Defendant Prince denied ever striking or intentionally hurting a child. He denied striking the victim as a "disciplinary strike." He said that the victim was a "little angel," who did not require much correction.

On cross-examination by the State, Defendant Prince denied that Defendant Beaty came to his house the same day that they exchanged messages on Facebook in August 2013. He said she came over the next day, spent the night, and returned home. He and Defendant Beaty saw each other "off and on" for approximately three weeks before she and the children moved into his home. Defendant Beaty lived with him until late February when he asked her to move out due to her drug use.

Defendant Prince said that, when Defendant Beaty was using drugs, she would "[s]cream, yell, holler" at the children, but he never saw her hit the children. Defendant Prince did not see the victim crying in pain or favoring his arm on October 28, 2013, before Defendant Prince left for work. He did not observe the argument between EP and LB. Defendant Prince was aware that on December 30, 2013, Ms. McCarley observed bruising on the victim's ears, jawline, and face. Defendant Prince confirmed that he was

told that the victim fell on a coffee table but that he did not witness it. LB and EP told him about the incident.

Defendant Prince could offer no explanation for the bruising to the victim or the subsequent broken bones discovered in January. He maintained that the victim never acted like he was injured or in pain. Defendant Prince confirmed that he was present when Dr. Perales talked with them about the skeletal survey and told them that she had notified DCS. He recalled that Dr. Perales told them that the bloodwork provided no explanation for the bruising and that there was no evidence of brittle bone disease. According to Defendant Prince, the victim was happy, affectionate, and exhibited no indication of pain.

Defendant Prince agreed that he was aware of the court order prohibiting his contact with the children and the removal from Defendant Beaty's custody. He agreed that the children stayed with Defendant Beaty's parents from March 12, 2014, through May 7, 2014, and suffered no injuries during that time period. Defendant Prince agreed that he had contact with the children between May 7, 2014, and June 1, 2014, with the knowledge that there was a no contact order in place.

Defendant Prince maintained that when he arrived at the Eastwood apartment on June 1, 2014, the victim was acting fine, and he observed no injuries on the victim. He did notice that after the victim got the cookie and crawled up on Defendant Prince's lap, his lip was bleeding "a little bit." He maintained that the victim was happy and giggling when Defendant Beaty returned to the Eastwood apartment.

After hearing the evidence, the jury convicted the defendants of felony murder in the perpetration or attempt to perpetrate aggravated child abuse and felony murder in the perpetration or attempt to perpetrate aggravated child neglect. The jury convicted Defendant Beaty of aggravated child endangerment. The trial court imposed an effective life sentence with the possibility of parole for Defendant Prince's convictions and an effective life sentence with the possibility of parole plus fifteen years for Defendant Beaty's convictions.

## II. Analysis

On appeal, Defendant Beaty asserts that: (1) the trial court erred when it allowed the State to amend the indictment; (2) the trial court erred when it admitted instances of prior abuse; (3) the evidence was insufficient to support a conviction for felony murder; and (4) the trial court erred when it failed to grant her motion for a mistrial based upon improper testimony from Dr. Palmer and Dr. Mileusenic-Polchan. Defendant Prince challenges: (1) the sufficiency of the evidence supporting his convictions; (2) the State's

amendment to the indictment; and (3) the trial court's denial of his motion for a mistrial based upon Dr. Mileusenic-Polchan's testimony that the victim's injuries resulted from torture. The State responds that the evidence was sufficient to support the defendants' convictions, the trial court properly allowed the State to amend, properly admitted instances of prior abuse and properly denied the motions for mistrial based upon trial testimony.

### A. Amendment to the Indictment

The defendants argue that the trial court improperly allowed the State to amend Count 2 of the indictment on the day of trial. Count 1 of the indictment charged the defendants with first degree felony murder during the perpetration of aggravated child abuse. Count 2 of the indictment charged, alternatively, that the defendants had committed first degree felony murder during the perpetration of aggravated child neglect. Count 2 of the indictment charged that the defendants:

> did unlawfully kill [the victim], Date of Birth: [ ] , with the intent to perpetrate or attempt to perpetrate any **aggravated child neglect** *by knowingly*, *other than accidental means, treating said child in a manner as to inflict injury resulting in serious bodily injury causing the death* of said child, in violation of Tennessee Code Annotated § 39-13-202 and against the peace and dignity of the State of Tennessee.

(emphasis added). Count 2 identified the underlying felony in support of felony murder as "aggravated child neglect," however, the italicized language is from the child abuse portion of Tennessee Code Annotated section 39-15-401. This statute addresses three crimes: (a) child abuse, (b) child neglect, and (c) child endangerment. The statute cited in the indictment references the felony murder statute which lists both aggravated child abuse and aggravated child neglect as applicable felonies.

At a hearing before the jury was sworn in, the State asserted that the indictment put the defendants on notice of the charges against them; however, the State sought to "clarify" the indictment by removing the language italicized above and replacing it with the language "knowingly abuse or neglect the child, a person under the age of 8 years, in such a way as to adversely affect the child's health and welfare resulting in death." This language reflects the statutory language found at Tennessee Code Annotated section 39-15-401(b).

Defendant Beaty's attorney conceded that they were not "surprised" by this change in the indictment but that the trial court should not make "a decision about what the grand jury intended." The trial court found that the defendants were put on notice

37

that they were charged with alternate counts of felony murder with intent to perpetrate or attempt to perpetrate aggravated child abuse in Count 1 and aggravated child neglect in Count 2. The trial court noted that "aggravated child abuse" was named in Count 1 of the indictment and "aggravated child abuse" was named in Count 2. Further, the indictment included the statute for felony murder which sets forth the applicable crimes, including aggravated child abuse and aggravated child neglect. Based upon these findings, the trial court granted the State's motion to amend.

An accused is constitutionally guaranteed the right to be informed of the nature and cause of the accusation. *State v. Lindsey*, 208 S.W.3d 432, 437-38 (Tenn. Crim. App. 2006) (citing U.S. Const. amend. 6, 14; Tenn. Const. art. I, § 9; *see Wyatt v. State*, 24 S.W.3d 319, 324 (Tenn. 2000)). Our courts have interpreted this constitutional mandate to require an indictment to: "1) provide notice to the accused of the offense charged; 2) provide the court with an adequate ground upon which a proper judgment may be entered; and 3) provide the defendant with protection against double jeopardy." *Lindsey*, 208 S.W.2d at 438 (citing *Wyatt*, 24 S.W.3d at 324). Further, an indictment is statutorily required to "state the facts constituting the offense in ordinary and concise language, without prolixity or repetition, in such a manner as to enable a person of common understanding to know what is intended, and with that degree of certainty which will enable the court, on conviction, to pronounce the proper judgment." *Id*. (citing T.C.A. § 40-13-202). An indictment need not conform to strict pleading requirements. *State v. Hill*, 954 S.W.2d 725, 727 (Tenn. 1997).

The Tennessee Rules of Criminal Procedure provide for an indictment to be amended. Tennessee Rule of Criminal Procedure 7(b) provides:

(b) Amending Indictments, Presentments and Informations.

(1) With Defendant's Consent. With the defendant's consent, the court may amend an indictment, presentment, or information.

(2) Without Defendant's Consent. Without the defendant's consent and before jeopardy attaches, the court may permit such an amendment if no additional or different offense is charged and no substantial right of the defendant is prejudiced.

The Tennessee Supreme Court continues to emphasize the relaxation of common law pleading requirements, as well as its reluctance to promote form over substance in examining the sufficiency of an indictment. *See State v. Hammonds*, 30 S.W.3d 294, 300 (Tenn. 2000). Indictments that satisfy the requirements for adequate notice to the defendant also satisfy constitutional and statutory requirements. *Id*. Correction of an

"unintentional drafting error" does not charge an additional or different offense nor prejudice a substantial right of the defendant if the indictment clearly charges the essential elements of the offense. *State v. Beal*, 614 S.W.2d 77, 80 (Tenn. Crim. App. 1981).

In the case under submission, we conclude that the trial court did not err when it allowed the State to amend the indictment. In *State v. Reid*, our supreme court determined that the trial court properly allowed the State to amend an indictment to change the predicate felony underlying two counts of felony murder from "especially aggravated robbery" to "robbery." 164 S.W.3d 286 at 312. The *Reid* Court explained that "no new or different offenses were alleged; to the contrary, the amended indictment, like the original indictment, charged two counts of felony murder. . . ." *Id*. Similarly, in this case, two of the charges against each of the defendants, and the superseding indictment, charged felony murder.

The language of the indictment, along with the specific reference to the statute allegedly violated, provided the defendants with ample notice of the offense charged. The indictment stated facts constituting the offense, including the names of the defendants, the date of the alleged offense, and the statute violated. Accordingly, because the indictment was sufficient prior to its amendment and no new or different offense was charged, we conclude that the amendment of the indictment was proper under Tennessee Rule of Criminal Procedure 7(b)(2). The defendants are not entitled to relief as to this issue.

## B. Prior Medical History of Injuries

Defendant Beaty appeals the trial court's admission of the victim's prior injuries since the injuries were not the cause of the victim's death. She maintains that the State could not use this proof to show she was given notice of child abuse because medical providers did not advise her of this until Dr. Perales spoke with her on January 31, 2014. She further contends that the unfair prejudice of this evidence outweighs the probative value. The State responds that the trial court acted within its discretion in admitting evidence of the victim's prior injuries for the purposes of showing that someone harmed the victim intentionally and repeatedly for months before his death, the defendants both knew the victim was being harmed, and the victim's fatal injuries were intentional and not accidental. We agree with the State.

Where the state seeks to present evidence of prior injury in child abuse and neglect cases, "[t]he initial determination to be made is 'whether the admissibility of the evidence of prior injuries is controlled by Rules 401 and 402 or whether Rule 404(b) is also applicable." *State v. Roberson*, 988 S.W.2d 690, 694-95 (Tenn. Crim. App. 1998)

(quoting *State v. Dubose*, 953 S.W.2d 649, 653 (Tenn. 1997)). Where the evidence does not indicate who caused the prior injuries, Rule 404(b) is not applicable and therefore admissibility of the evidence is determined under Rules 401 and 402. *Id*. at 695.

In this case, the testimony regarding the victim's injuries did not indicate who had caused them. Therefore, this court need only determine "whether the evidence was relevant to proving a material issue and, if so, whether it should have been excluded" pursuant to Rule 403 of the Tennessee Rules of Evidence. *Id*. The standard of review for this determination is an abuse of discretion standard. *Dubose*, 953 S.W.2d at 654.

The State was required in this case to prove that Defendant Beaty either inflicted the fatal injury or so neglected the victim as to result in his death. The statute requires the State prove that Defendant Beaty acted "knowingly, other than by accidental means." T.C.A. § 39-15-401(a) (2019). To the extent that the State was attempting to prove that Defendant Beaty was guilty of first degree felony murder by aggravated child abuse through her neglect of the victim, the victim's ongoing injuries, from October through March, were relevant to establish what Defendant Beaty had known about the victim's physical condition. That is, it was relevant to prove that Defendant Beaty knew the victim was in danger and failed to intervene.

The record belies Defendant Beaty's contention that she was unaware of abuse prior to January 31, 2014. Ms. McCarley testified that on October 29, 2013, after the victim was treated for a fractured collarbone, she told Defendant Beaty about her concerns for the victim's safety and that she was referring the case to DCS for investigation. Although DCS later closed the case, Defendant Beaty was aware that the victim was sustaining unexplained injuries. Ms. McCarley also spoke with Defendant Beaty about ways to ensure child safety in December 2013, after additional injuries were observed on the victim.

Accordingly, we conclude that because the evidence of the victim's prior injuries was relevant to prove a material issue and the probative value is not substantially outweighed by the danger of unfair prejudice, the trial court properly admitted this medical testimony. Defendant Beaty is not entitled to relief as to this issue.

## C. Sufficiency of the Evidence

Defendant Beaty and Defendant Prince both challenge the sufficiency of the evidence as to the felony murder convictions. The State maintains that there was sufficient evidence to support the defendants' convictions. We agree.

### 1. Defendant Prince

Defendant Prince asserts that the evidence is insufficient because the State failed to prove that he took "any affirmative actions" to commit aggravated child abuse, the underlying felony for the first degree felony murder conviction. He further argues that there is no direct evidence he killed the victim and that the State failed to present proof "so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant." *State v. Crawford*, 470 S.W.2d 610, 613 (1971). The State maintains that there is sufficient proof to sustain Defendant Prince's convictions for first degree felony murder based upon aggravated child abuse and aggravated child neglect.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999) (citing *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990)). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this Court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999) (citing *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956)). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland,* 958 S.W.2d 651, 659 (Tenn. 1997). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523, 527 (Tenn. 1963)). This Court must afford the State of Tennessee the "'strongest legitimate view of the evidence'" contained in the record, as well as "'all reasonable and legitimate inferences'" that may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000) (citations omitted).

Aggravated child abuse occurs when the accused knowingly, other than by accidental means, treats a child under the age of eighteen in such a manner as to inflict injury and the act of abuse results in serious bodily injury to the child. T.C.A. § 39-15-401(a)(2019); § 39-15-402(a)(1) (2019). Felony murder is "[a] killing of another committed in the perpetration of or attempt to perpetrate any first degree murder, act of . . . aggravated child abuse, [or] aggravated child neglect . . . ." T.C.A. § 39-13-202(a)(2) (2018).

A person commits child neglect when that person "knowingly . . . neglects a child under eighteen (18) years of age so as to adversely affect the child's health and welfare . . . and the act of . . . neglect . . . results in serious bodily injury to the child." T.C.A. § 39-15-401(b); T.C.A. § 39-15-402(a)(1). In short, child neglect is composed of three essential elements: "(1) a person knowingly must neglect a child; (2) the child's age must be within the applicable range set forth in the statute; and (3) the neglect must adversely affect the child's health and welfare." *State v. Sherman*, 266 S.W.3d 395, 404 (Tenn. 2008). In order to establish neglect, the State must first show that a defendant owed a legal duty to the child. *Id*. A defendant may be subject to criminal liability for child neglect when the defendant stands *in loco parentis* to the child. *Id*. at 405. A person stands *in loco parentis* when that person assumes the full responsibilities of a parent. *Id*. at 406 (citing *Norton v. Ailor*, 124 Tenn. 563, 566 (1883) (stating that when a stepfather admits a child into his household, he assumes "the obligation of the father as respects the support of his minor child")).

The evidence, considered in the light most favorable to the State, showed that the victim's death was caused by child abuse. Defendant Prince entered the victim's life in August 2013 and assumed a caretaking role for the victim when Defendant Beaty and her children moved in with him. After their joining of households in August 2013, the first sign of abuse, a fractured collarbone, was identified by Ms. McCarley and treated at Children's Hospital in October 2013. During the seven months leading up to the victim's death he suffered ongoing, unexplained injuries. The victim sustained bruising to the cheeks, eye, ears, jawline, forehead, and the nail beds of his finger and toes. Further, he sustained four fractures during the seven-month period preceding his death to his collarbone, left arm, right thumb, and lower leg. In March 2014, he showed signs of injury to his spinal cord and aorta that caused an infection throughout his body, necessitating a ten-day hospital stay for treatment. Ultimately, the victim died as a result of a severed spine and transected aorta that would have required someone of an adult's size and "great force" to inflict.

Defendant Prince agreed that he was present during medical appointments where abuse was identified as a concern. Although not served the order, Defendant Prince admitted that he knew he was to have no contact with the victim as early as January 31, 2014, but he continued to interact with the victim from "the beginning." Defendant Prince was fully aware of each and every unexplained injury that occurred over the course of the seven-month period leading up to the victim's death and the concerns about his contact with the victim. He ignored all signs and warnings of abuse and failed to protect the victim from the ongoing, escalating abuse.

The medical examiner concluded that the manner of death was homicide based upon her extensive findings of trauma during the autopsy. She explained her conclusion by stating that there was not a possible "accidental way" that the victim could sustain such extensive trauma. Likewise, Ms. McCarley, Dr. Perales, and Dr. Palmer all testified that the victim's injuries were not caused by normal childhood injury and were not accidental. The medical examiner testified that the victim died within seconds of sustaining the aorta injury.

On June 1, 2014, Defendant Prince volunteered to care for the victim while Defendant Beaty went to the store. By either defendants' testimony, Defendant Prince was holding the victim in the time immediately before his collapse. This evidence is sufficient from which the jury could conclude the victim suffered serious bodily injury by means that were not accidental and that the victim died as a result of his injuries. As such, the evidence is sufficient to support a finding of aggravated child abuse and felony murder in the perpetration of aggravated child abuse.

43

As to the Defendant's argument that the State failed to show he took "any affirmative action" in the death of the victim, we conclude that the evidence indicates otherwise. By all accounts, he shared the role of caregiver with Defendant Beaty. The decline in the victim's physical well-being began around the time Defendant Beaty moved in with Defendant Prince. The medical examiner said that the injury to the victim's aorta occurred seconds before he bled out and died. During this time and the hour or more leading up to the injury, the Defendant was the person who assumed the role of taking care of the victim and the last person to touch the victim before he died. This is sufficient evidence for a jury to conclude that the Defendant was guilty of aggravated child abuse.

Finally, we address Defendant Prince's reliance on *State v. Crawford*, to argue that the State did not meet the standard of proof for circumstantial evidence with respect to both of his felony murder convictions. Defendant Prince's assertion that because his convictions were based upon circumstantial evidence, the State was required to rule out every reasonable hypothesis except that of guilt is simply no longer the law in Tennessee. Instead, circumstantial evidence alone is sufficient to sustain a conviction and is treated the same as direct evidence when weighing the sufficiency of the evidence. *See Dorantes*, 331 S.W.3d 370 (Tenn. 2011). The *Dorantes* standard recognizes that the trier of fact is in a better position than this court to weigh the evidence and decide between the competing plausible theories presented by the State and a defendant. Accordingly, this court's duty on appeal is "not to contemplate all plausible inferences in the [d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." *State v. Sisk*, 343 S.W.3d 60, 67 (Tenn. 2011).

Accordingly, the evidence was sufficient to support the jury's finding beyond a reasonable doubt that the Defendant committed felony murder in the perpetration of aggravated child abuse and felony murder in the perpetration of aggravated child neglect. Defendant Prince is not entitled to relief as to this issue.

## 2. Defendant Beaty

Defendant Beaty challenges her convictions for felony murder in the perpetration of or attempt to perpetrate aggravated child abuse and felony murder in the perpetration of or attempt to perpetrate aggravated child neglect. She asserts that the State failed to prove aggravated child abuse as the underlying felony because: (1) she was physically unable to exert the amount of force necessary to inflict the victim's injuries; (2) she was not home when the abuse occurred; and (3) her failure to protect does not constitute infliction of injury. As to the felony murder in the perpetration of or attempt to perpetrate aggravated child neglect conviction she says the proof is insufficient because failure to protect is child endangerment. She does not contest her child endangerment conviction.

The evidence, viewed in the light most favorable to the State, showed that Defendant Beaty knowingly created an unsafe environment where the victim's escalating injuries were likely to result in serious bodily injury. Defendant Beaty knew in October of 2013 that the victim had sustained a broken collarbone that necessitated Ms. McCarley reporting the unexplained incident to DCS. The victim's injuries continued through December with Defendant Beaty offering no more than speculation for the possible cause of the victim's repeated injuries as a baby less than a year old. In January 2014, she was confronted with additional broken bones, more bruising, and Dr. Perales telling her the victim was being abused. Her children were removed from her custody and yet, after two weeks she returned them to the exact same environment where the victim had been repeatedly injured because she did not want "to be alone." In March 2014, the victim's injuries became more serious with injury to the victim's spine that resulted in a serious infection that spread throughout his body. As a result, the victim was hospitalized for ten days.

Defendant Beaty twice agreed that her children would have no contact with Defendant Prince but made no effort whatsoever to enforce this provision. Defendant Beaty knew the victim was being repeatedly injured, the court system prohibited contact with Defendant Prince, and still she actively pursued Defendant Prince's presence in her home and her children's lives. Defendant Beaty did not merely fail to protect the victim. She knowingly created an environment in which the victim would almost certainly continue to be injured and ultimately was killed. *See State v. Ducker*, 27 S.W.3d 889, 897 (Tenn. 2000) (Affirming aggravated child abuse in case where defendant securely fastened her children into their car seats, closed the windows, and locked the doors before leaving the children alone in the car.) In our view, there was sufficient proof for a jury to conclude that Defendant Beaty knowingly inflected injury that resulted in serious bodily injury.

Likewise, based upon the proof outlined above, the jury could rationally infer that the Defendant acted knowingly when she failed to take the necessary steps to protect the victim, and that this neglect adversely affected the victim's health and welfare, resulting in serious bodily injury, in this case, his death. We conclude that the evidence was sufficient to sustain the Defendant's conviction for felony murder in the perpetration of aggravated child abuse and felony murder in the perpetration of aggravated child neglect.

### D. Motion for Mistrial

The defendants contend that the trial court erred in refusing to declare a mistrial. Defendant Beaty asserts that Dr. Palmer and Dr. Mileusnic-Polchan both made statements that constituted an appeal to the jury's sympathy; therefore, the trial court

should have granted a mistrial. Defendant Prince challenges only Dr. Mileusnic-Polchan's testimony. The State responds that the conduct complained of does not rise to the level of "manifest necessity," thus the trial court properly declined to grant a mistrial. We agree with the State.

The purpose of a mistrial is to correct the damage done to the judicial process when some event has occurred that would preclude an impartial verdict. *See Arnold v. State*, 563 S.W.2d 792, 794 (Tenn. Crim. App. 1977). A mistrial is appropriate "when the trial cannot continue, or, if the trial does continue, a miscarriage of justice will occur." *State v. McPherson*, 882 S.W.2d 365, 370 (Tenn. Crim. App. 1994). The decision of whether to grant a mistrial is within the sound discretion of the trial court. *State v. McKinney*, 929 S.W.2d 404, 405 (Tenn. Crim. App. 1996). Normally, a mistrial should be declared only if there is a manifest necessity for such action. *Arnold v. State*, 563 S.W.2d 792, 794 (Tenn. Crim. App. 1977). One description of manifest necessity is that, "[i]f it appears that some matter has occurred which would prevent an impartial verdict from being reached," a mistrial must be declared. *Id.* Additionally, a manifest necessity exists when "no feasible alternative to halting the proceedings" exists. *State v. Knight*, 616 S.W.2d 593, 596 (Tenn. Crim. App. 1981). The burden of establishing a manifest necessity lies with the defendant. *State v. Seay*, 945 S.W.2d 755, 764 (Tenn. Crim. App. 1996). This Court will not disturb that decision unless there is an abuse of discretion. *State v. Adkins*, 786 S.W.2d 642, 644 (Tenn. 1990); *State v. Williams*, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996).

In determining whether there is a "manifest necessity" for a mistrial, "'no abstract formula should be mechanically applied and all circumstances should be taken into account.'" *State v. Mounce*, 859 S.W.2d 319, 322 (Tenn. 1993) (quoting *Jones v. State*, 218 Tenn. 378, 403 S.W.2d 750, 753 (Tenn. 1966)). Although Tennessee courts do not apply any exacting standard for determining when a mistrial is necessary after a witness has injected improper testimony, this court has considered: (1) whether the improper testimony resulted from questioning by the State, rather than having been a gratuitous declaration; (2) the relative strength or weakness of the State's proof; and (3) whether the trial court promptly gave a curative instruction. *See State v. Demetrius Holmes*, No. E2000-02263-CCA-R3-CD, 2001 WL 1538517, at *1-4 (Tenn. Crim. App., at Knoxville, Nov. 30, 2001); *State v. William Dotson*, No. 03C01-9803-CC-00105, 1999 WL 357327, at *4 (Tenn. Crim. App., at Knoxville, June 4, 1999).

**1. Dr. Palmer's Testimony**

Defendant Beaty asserts that Dr. Palmer's testimony regarding a photograph of the victim's face warranted mistrial and that the trial court erred in failing to grant her motion.

At trial, the State had been introducing photographs of the victim's March injuries through Dr. Palmer who had taken the photographs. The State asked about each photograph, and Dr. Palmer would identify the injury she was documenting. At one point in the review of various photographs, the following exchanged occurred.

> STATE: Now, here's a photo of a baby's face. Is that baby [the victim]?
>
> DOCTOR: That is [the victim] and that's the day he was discharged.
>
> STATE: Do you recall why that photograph was taken?
>
> DOCTOR: Ah, I took it because I was, sorry, I was so impressed with how happy he looked, ah, as opposed to –

Defendant Beaty's attorney objected and motioned for a mistrial. The State responded, "I don't intend to introduce that photograph after hearing the reason it was taken, Your Honor. That's not what I understood when I offered it." Defendant Beaty's attorney acknowledged that "it was [not] done purposely" by the State. The trial court promptly gave the following curative instruction to the jury, "You will disregard the Doctor's last statement about the photograph she viewed, and you're not to refer to that statement at all in your deliberations. Is that understood?"

In light of the non-exclusive factors, we conclude that the factors weigh in favor of the trial court's denial of a mistrial. There is nothing in the record that indicates that the State intentionally elicited this testimony from Dr. Palmer. The State was introducing photographs of the victim's injuries through Dr. Palmer. In a jury-out hearing, the State expressed surprise at Dr. Palmer's response and that it had not intended to elicit that testimony from Dr. Palmer. Defense counsel also stated that it did not believe that the prosecutor had intentionally elicited the response. The trial court, finding that the comment did not rise to the level of manifest necessity, issued a curative instruction to the jury. This Court presumes that juries follow the instructions of the trial court unless the record presents proof to the contrary. *State v. Butler*, 880 S.W.2d 395, 399 (Tenn. Crim. App. 1994).

Further, as discussed in this opinion, the State produced ample evidence to sustain convictions against Defendant Beaty. Accordingly, we conclude that the trial court did not abuse its discretion when it declined to declare a mistrial at this point in the proceedings.

## 2. Dr. Mileusenic-Polchan's Testimony

Defendant Beaty and Defendant Prince assert that the trial court should have granted a mistrial after Dr. Mileusenic-Polchan referenced torture to the victim during her testimony.

During cross-examination, Defendant Beaty's attorney began a line of questioning with regard to whether the aorta could have ruptured more easily due to the presence of the scar tissue from the prior March 2014 injury. Dr. Mileusenic-Polchan responded that it would depend upon the mechanism. She opined that the aorta likely would have been protected by the scar tissue and the transection would have required "a lot of force" but "it's hard to tell where the force really came from, whether it was twisting or flexing." Upon further questioning, she stated that it took a great deal of force to split the aorta, but she could not state what type of movement was required. Defendant Beaty's counsel continued to question her on this point. At one point the State objected as "asked and answered." Dr. Mileusenic-Polchan once more attempted to explain, at length, why she could not say with certainty whether the scarring played a role in the injury because she did not know the cause. Defendant Beaty's attorney continued with this line of questioning, and the State objected again. The trial court told Defendant Beaty's attorney to "move on." The questioning resumed:

> COUNSEL: Now, this would take a lot of force.
>
> DOCTOR: (No audible response)
>
> COUNSEL: Right?
>
> DOCTOR: Ah, it would take a lot of force, yes. He was tortured until finally [the] aorta snapped."

Defendant Beaty's attorney objected and both Defendant Beaty's and Defendant Prince's attorney requested a mistrial. The trial court stated that the witness's statement was in response to Defendant Beaty's attorney "asking the witness over and over and over again about whether or not the aorta being anchored [by scar tissue] would have any effect on how the baby died. . . . . And she gave an answer that you weren't satisfied with[.]" After further discussion the trial court determined that the statement did not create a manifest necessity to declare a mistrial and that a curative instruction would adequately address the issue. The trial court instructed the jury to disregard the statement, "act as though you never heard that statement" and that the jury was not to rely on the statement during deliberations at all.

The factors also weigh in favor of the trial court's denial of a mistrial on the basis of Dr. Mileusenic-Polchan's statement. The improper testimony resulted from questioning by Defendant Beaty's attorney, not the State, and the trial court promptly gave a curative instruction that the statement was not to be considered by the jury. As stated above, we are to presume this jury followed the trial court's instruction absent proof to the contrary. *Id.* As discussed in detail in this opinion, the State's case against the defendants was strong. Accordingly, we conclude that the trial court did not abuse its discretion when it declined to declare a mistrial. The defendants are not entitled to relief on this issue.

## E. Merger

From a purely procedural standpoint, we note that the trial court erred by failing to note on the judgments that it was merging each of the defendants' two felony murder convictions. *See State v. Berry*, 503 S.W.3d 360 (Tenn. 2015). Accordingly, we remand this case for the trial court, as to each defendant, to enter a corrected judgment in Count 2 indicating merger with Count 1.

## III. Conclusion

Based upon the foregoing reasoning and authorities, we affirm the trial court's judgments and remand to the trial court for the entry of corrected judgments reflecting the merger as set forth herein.

_____
ROBERT W. WEDEMEYER, JUDGE

49